UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| BARRY HIGGINS, | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | Civil No. 04-157-B-W |
| PENOBSCOT COUNTY SHERIFF'S DEPARTMENT, et al. | ) ) ) ) | |
| Defendants | ) | |

### RECOMMENDED DECISION ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

This is an action brought by Barry Higgins arising from events related to him being ousted from family-owned property in Carmel, Maine.  Higgins moves for partial summary judgment with respect to one count of his complaint and only as to the liability of Defendant Joshua Tibbetts, a deputy sheriff with the Penobscot County Sheriff's Department. (Docket No. 14.)  Apropos this claim Higgins contends that Tibbetts violated his rights under the Fourth and Fourteenth Amendments of the United States Constitution when he responded to a call over a dispute at the property.   As there is a genuine dispute of material fact as to whether or not Barry Higgins had a possessory interest in the property that would be protected by the Fourth and/or Fourteenth Amendment, I recommend that the Court **DENY** the motion for partial summary judgment.

## *Discussion*

### *Summary Judgment Standard*

With respect to summary judgment Higgins is entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [he is]  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the defendants, the nonmovants, and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation.  Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).  If such facts and inferences could support a favorable verdict for the defendants, then there is a trial-worthy controversy and summary judgment must be denied.  ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

***Material Facts***[1]

While this record is rife with disputes concerning material (and nonmaterial) facts there is no dispute that Barry Higgins and his father, Leo Higgins purchased the T & N Trailer Park (in Carmel, Maine) in 1972.  (Pl.'s SMF ¶ 1; Defs.'s Opp'n SMF ¶ 1.)

### *Plaintiff's Version of Events*

Barry Higgins asserts the following facts concerning his interest in the property. Barry Higgins and Leo Higgins formed a partnership at the time of the 1972 purchase. (Pl.'s SMF ¶ 1)   They filed partnership tax returns from 1972 to1989 and refinanced the property on at least two occasions in approximately 1980 and 1986. (Id. ¶ 2.)  Barry Higgins paid for and built a garage/residence on the T & N Trailer Park property over a period of years. He completed the building in 1981 and resided there from 1981 until May 15, 2002. (Id. ¶ 3.)  When they purchased the trailer park, Barry and Leo Higgins agreed that all members of their immediate family would have a lifelong place to reside

---

[1] The defendants filed a motion for leave to file a response to Higgins's reply memorandum addressing Higgins's argument that the court should disregard the Tibbetts affidavit because it contradicts prior testimony by Tibbetts. (Docket No. 30.)  Higgins opposed the motion. (Docket No. 32.)  I entered an order denying the defendants' motion, indicating that I would address the Tibbetts testimony and affidavit in the context of these recommended decisions on the pending cross-motions for summary judgment and that the parties would then have an opportunity to object. (Docket No. 37.)

As the facts are set forth below, each side's bent on this evidence is examined.  More generally I note that the testimony by Tibbetts relied on by Higgins to controvert the defendants' factual assertions is not dramatically inconsistent with Tibbetts's affidavit.  In Tibbetts's testimony  (Resp. SMF Attach. 1, Docket No. 28) there are identifiable nuances that may support a conclusion that Tibbetts had some reason to conclude that Barry Higgins, while not claiming to own the land, was residing in the garage at the time Tibbetts responded to the call (e.g., Higgins retrieved certain items in a suitcase and suggested that he had guns pointed at all doors).  However, Tibbetts's prior testimony could support a factual conclusion that, as Tibbetts understood it, Barry Higgins was not claiming a right to stay on the property (e.g., Higgins told him he had not been living there, would not provide him with an address of where he was living, and was driving a car with out-of-state plates).  I see no reason to disregard Tibbetts's affidavit and note that a juxtaposition of the testimony and the affidavit only illustrate further how there is a genuine dispute of facts that are material to two key issues in this litigation: whether or not Barry had a possessory interest in the property and whether or not Tibbetts understood Barry to be claiming such at interest when he told Barry to leave.

3

at the park if needed and upon completion of the park, if a family member did not reside there, that family member would receive the rent from one lot. (Id. ¶ 4.)

According to Barry Higgins, in July 1989, Barry Higgins was in the process of a divorce, and Attorney Julio DeSanctis advised him and his father Leo that as a precaution for Barry's upcoming divorce, it would be wise to transfer the park into Leo's name. (Id. ¶ 5.)  Attorney DeSanctis advised Barry and Leo that since they had already been in partnership/ownership together prior to Barry's marriage, this would not be construed as anything illegal. (Id. ¶ 6.)  Barry and Leo agreed that to protect their partnership agreement, a second deed would be done at the same time, deeding Barry's interest back to Barry, although that second deed would not be recorded until a later date.  (Id. ¶ 7.) Barry's sister Jacquelyn was at that time Attorney DeSanctis's secretary. When Jacquelyn called and said the deeds were ready, Barry drove to Attorney DeSanctis's office in Orrington to find that only one deed had been prepared, the one conveying his interest to his father. (Id. ¶ 8.)  Jacquelyn told Barry that the second deed was not ready yet, and she insisted that he nonetheless sign the first deed as there was a hearing in Barry's divorce case later that day and it was in his best interest to have the deed recorded before the hearing. (Id. ¶ 9.)  Barry reluctantly signed the deed; however, the second deed was never prepared. (Id. ¶ 10.)  After the signing and recording of that deed in 1989, Barry continued to be liable on notes the partnership had taken on the property despite the deed transfer.  (Id. ¶ 11.)  Barry continued to live at the property despite the record transfer of ownership in 1989, and lived there up until on or about May 15, 2002. (Id. ¶ 12.)

With respect to the encounter on May 15, 2002, Barry says that he got up in the morning and found his sister Irene in his garage, and Irene told him that it was not his

garage and that she was going to call the sheriff. (<u>Id.</u> ¶ 13.) Because of the dispute

regarding his right to live at the property, Barry agreed it was a good idea to call the

sheriff. Barry placed a call to the sheriff's department and informed them there was a

dispute. (<u>Id.</u> ¶ 14.)  Deputy Sheriff Joshua Tibbetts arrived at the property, and Barry told

him that Barry and his father Leo were engaged in a civil dispute over ownership of the

property and Barry's right to reside at the property. (<u>Id.</u> ¶ 15.) Barry told Tibbetts that the

police had been called on several occasions before, including the state police, and that

they had told Barry and Leo that this was a civil dispute and that the police would not get

involved. (<u>Id.</u> ¶ 16.)  Tibbetts waited at the property until Barry's father, Leo, arrived.

Leo showed Deputy Tibbetts a copy of the deed. (<u>Id.</u> ¶ 17.)  Tibbetts then told Barry that

he had to leave the property. Barry protested that this was a civil matter and that Tibbetts

did not have the right to tell him to leave, but Tibbetts said that Leo had a deed and Barry

had to leave, that's all there was to it. (<u>Id.</u> ¶ 18.)  Tibbetts told Barry that he had five

minutes to get his belongings and leave or he would be arrested. (<u>Id.</u> ¶ 20.) Tibbetts

actually gave Barry closer to fifteen minutes and he was able to gather a few possessions,

but was forced to leave without being able to take all of his belongings. (<u>Id.</u> ¶ 22; Defs.'

Opp'n SMF ¶ 20.) Barry asked Tibbetts to come into the residence and look at his

possessions so they could ensure they would still be there when he returned, but Tibbetts

refused. (Pl.'s SMF ¶ 23.) Tibbetts also warned Barry not to return to the property or he

would be arrested. (<u>Id.</u> ¶ 21.)  After Barry left the property, many of his possessions

disappeared or were damaged.  (<u>Id.</u> ¶ 24.)

   There was no court order for Barry's eviction from the property as of May 15,

2002.  (<u>Id.</u> ¶ 19.) According to Barry Higgins, Leo Higgins had made at least two other

reports to the Penobscot County Sheriff's Department in an attempt to have Barry ejected from the property. On each of those occasions, the deputy who responded told Leo that it was a civil matter and he must go through an attorney or an eviction process. (Id. ¶ 25.)[2]

Barry Higgins received his mail at the property until May 2002 when the mailbox lock was changed, kept his tools and equipment in the garage, kept his vehicles registered at that address, maintains to this day telephone service at the property, and to this day has the electrical service in his name and pays that bill each month. (Id. ¶ 26.)[3]

The Maine Sheriffs' Association published a Civil Process Manual in 1997 which includes a section on Entry and Detainer. That manual discusses the United States Supreme Court's Soldal v. Cook County, Illinois, 506 U.S. 56 (1992) and contains the advice, "Always make sure there is a valid writ of possession before an eviction begins. . . . Do not participate in illegal evictions." (Id. ¶ 27.)

**_Defendants' Version of Events_**

The defendants counter, with respect to the ownership and tenancy rights in the property, that Barry and Leo purchased the property as tenants in common and no partnership was contemplated and no partnership agreement was prepared or signed (Defs.'s Opp'n SMF ¶ 1.) Sometime in the late 1980's, Leo took out a $60,000 loan so that Barry could upgrade the septic system on the lot and Leo's home was the collateral for that loan. (Leo Higgins Aff. ¶ 14.)[4] Leo contends that Barry made approximately

---

[2]     The defendants ask the court to strike this paragraph on the grounds that the records for these contacts are hearsay. They also argue that these prior contacts are not relevant because there is no evidence that Tibbetts was aware of his department's prior rebuffs.

[3]     Again, the defendants assert that this information is not relevant because there is no evidence that Tibbetts was aware of it. However, the fact is relevant to whether or not Barry Higgins had a possessory interest in the property which is a necessary predicate for success on his Fourth and Fourteenth Amendment claims.

[4]     In their opposing statement of material fact the defendants seldom make the effort to explain the nature of their qualification or denial. Instead they cite to (often multiple) paragraphs of certain affidavits.

fourteen payments on that loan. (<u>Id.</u> ¶ 15.)  At some time during the year or so that Barry was making payments on this loan he went to the bank and refinanced the loan in order to lower the monthly payment. The new loan agreement called for a balloon payment near the end of the loan.  Leo did not know anything about this refinancing until the bank notified Leo that a balloon payment was due.  He went to the bank to investigate and found that someone had forged his name on the refinancing documents.  (<u>Id.</u> ¶ 16.) At some point around 1990, Barry threw the payment book at Leo's feet and told Leo to pay the loan or lose his home. Because Leo's home was the collateral on that loan, he continued to make the payments until the loan was paid off in approximately 1993 or 1994. (<u>Id.</u> ¶ 17.)

To this day, according to the defendants, the building which is located on the lot which is the subject of this litigation has not been completed.  (<u>Id.</u> ¶ 5.) A majority of the lumber which was used to construct the building that stands on this lot came from trees which were cut off of the trailer park property. (<u>Id.</u> ¶ 6.)   Leo obtained permission to cut the trees on the lot from the former owner John Graham, Jr., because Leo was still making payments on the property.  (<u>Id.</u> ¶ 7.)   Leo purchased most of the supplies used for constructing the building.  Leo was working in Waterville at the time, and he would often stop at Marden's (a salvage discount warehouse) and purchase things for use in the building, such as T-11, cases of nails, and the like. (<u>Id.</u> ¶ 8.) He also purchased the cement blocks used for the foundation of the building.  (<u>Id.</u> ¶ 9.)  Barry Higgins paid for very little of the building materials. (<u>Id.</u> ¶ 10.)  Barry has not lived at the property since 1998 or 1999.  (<u>Id.</u> ¶ 18.)

---

Although I wish to discourage this approach, I have located the cited paragraphs and set forth their contents.

According to the defendants, at the time the property was purchased, it was Leo's intention (and his daughter's understanding) that each of his thirteen children would be allowed the use of one lot in the trailer park which they could use themselves or rent out to others.  (Id. ¶ 4; Irene Higgins Aff. ¶ 3.)   Leo claims that he never spoke with Julio DeSanctis about Barry's divorce although he knew DeSanctis socially.  (Leo Higgins Aff. ¶ 11.)  Leo never spoke with Julio DeSanctis about placing the deed to the trailer park property in his name alone to protect that asset during Barry's divorce. Barry did deed his interest in the park to him. (Id. ¶ 12.)  Prior to Barry's divorce, Leo never had any discussion with Barry about preparing a "second deed" which would have transferred title to the trailer park back to Barry and Leo after his divorce.  (Id. ¶ 13.)

According to the defendants, on May 15, 2002, Irene Higgins was present at the property and heard a noise in the garage. She did not see any vehicles around and became alarmed. Since there was no phone at the property, she went to a nearby store and called her brother-in-law, David Prescott.  She told him that she had heard a noise and asked him to call the sheriff's department. She claims that she had no reason to suspect that Barry was at the property.  (Irene Higgins Aff. ¶ 4; see also Leo Higgins Aff. ¶¶ 18, 19.) David Prescott affirms that Irene Higgins called and told him that she had heard a noise coming from inside the building at the trailer park lot. She asked Prescott to call the sheriff's department, which he did.  (Prescott Aff. ¶ 2.)  After calling the sheriff, he went over to the property.  (Id. ¶ 3.)  He had an idea that Barry might be in the apartment, but he had no way of knowing that for sure.  (Id. ¶ 4.)

The defendants assert that Tibbetts was told by Barry Higgins that he in the past had a partnership with his father that involved the real estate and the property. (Tibbetts

Aff. ¶ 7, Docket No.17 Attach. 6.) Barry Higgins, Tibbetts says, told him that he wanted to retrieve certain items of personal property that he claimed he owned and that were in the building.  (Id. ¶ 6.)  According to Tibbetts Barry indicated to him that he had lived on the property previously and had moved off several years before. (Id. ¶ 7.)  Leo Higgins told Tibbetts that he had previously notified Barry that he should not be on the property (id. ¶ 8) and that there was a civil dispute between Barry and Leo about various items of personal property -- such as tractors and excavation equipment -- and that he had a lawyer involved (id. ¶ 13).  Tibbetts claims he asked Barry for his address, but he would not provide it (id. ¶ 16) and that Barry was driving a truck with Connecticut license plates (id. ¶ 17).  Tibbetts believed that the building which Barry Higgins now claims was his residence was vacant at the time in question and had been for some time.  (Id. ¶ 18.)  He believed this because there were no stairs to enter the building. There was only a ladder which one could access the doorway of the garage.  (Id. ¶ 19.)  He had also driven by the building on many, many occasions before; it always appeared to him to be vacant. (Id. ¶ 20.)  Tibbetts had never seen any activity in the building, never saw any doors or windows open, and never saw any lights on (id. ¶ 21), there was lots of junk in the dooryard that was always in the same place, and Tibbetts never saw vehicles coming or going or parked in the dooryard (id. ¶ 22).  Tibbetts claims that neither Barry Higgins nor Leo Higgins told him that there was a dispute over Barry residing at the property.  (Id. ¶ 23.)  Irene Higgins relays that when Barry came down, he told Tibbetts that there was a civil dispute involving his right to be there.  He did not mention that there was a dispute involving his right to live there.  (Irene Higgins Aff. ¶ 11.)

Leo Higgins and David Prescott state that on none of the occasions that the police were called to the property did any of the responding officers ever tell Leo this was a civil dispute between Barry and Leo and that the police were not going to get involved. Nor was Leo ever told by a law enforcement officer that he must see an attorney and begin an eviction proceeding against Barry.  (Leo Higgins Aff. ¶ 19; Prescott Aff. ¶ 6.) Leo states that there was no court order for Barry's eviction from the property as of May 15, 2002, because Barry was never "evicted" because he was not a tenant (Leo Higgins Aff. ¶ 20); he had not lived on the property since 1998 or 1999 (id. ¶ 18). There was, however, a No Trespass Notice in effect on that date.  (Id.  ¶ 20; Def.'s SMF Ex. A.)

The defendants admit that a deed was shown to Tibbetts indicating that Leo was the owner of the property but it is not clear (or material) whether Irene or Leo showed the deed to Tibbetts.  (Defs.' Opp'n SMF ¶ 17; Tibbetts Aff. ¶ 12; Irene Higgins Aff. ¶ 8.) Irene and Leo Higgins both claim that Barry did not ask Tibbetts to go up into his apartment to look at his possessions so they could be sure that the possessions would still be there when he returned.  (Irene Higgins Aff. ¶ 12; Leo Higgins Aff. ¶ 21.)

Finally, the defendants point out that there is no evidence that Tibbetts had knowledge of the contents of the Maine Sheriffs' Association Civil Process Manual. (Defs.' Opp'n SMF ¶ 27.)[5]

***The Constitutional Claims***

### ***The Fourth Amendment Claim***

---

[5]     The defendants also argue that Higgins is relying on hearsay in support of this statement. However, in responding to the defendants' motion for summary judgment Higgins has filed an affidavit which is arguably sufficient to overcome this objection   (See Resp. SMF Attach. 4, Docket No. 28.)

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  With respect to his Fourth Amendment claim Higgins identifies <u>Soldal</u> as establishing the Fourth Amendment right not to have his possessory interest as a tenant seized unreasonably by Tibbetts.

In <u>Soldal</u> the United States Supreme Court reasoned:

> A "seizure" of property, we have explained, occurs when "there is some meaningful interference with an individual's possessory interests in that property." <u>United States v. Jacobsen</u>, 466 U.S. 109, 113 (1984). In addition, we have emphasized that "at the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home." <u>Silverman v. United States</u>, 365 U.S. 505, 511 (1961). <u>See</u> <u>also</u> <u>Oliver v. United States</u>, 466 U.S. 170, 178-79 (1984); <u>Wyman v. James</u>, 400 U.S. 309, 316 (1971); <u>Payton v. New York</u>, 445 U.S. 573, 601 (1980). As a result of the state action in this case, the Soldals' domicile was not only seized, it literally was carried away, giving new meaning to the term "mobile home." We fail to see how being unceremoniously dispossessed of one's home in the manner alleged to have occurred here can be viewed as anything but a seizure invoking the protection of the Fourth Amendment. Whether the Amendment was in fact violated is, of course, a different question that requires determining if the seizure was reasonable. That inquiry entails the weighing of various factors and is not before us.

506 U.S. at 61-62.

The seizure of Soldal's mobile home was undeniably more tangible than the seizure described by Higgins.  However, Higgins makes the following argument for why <u>Soldal</u> extends to the facts underlying his claim:

> The United States Supreme Court decided in 1992 that property interests are protected by the Fourth Amendment even though privacy or liberty may not be implicated. <u>Soldal v. Cook County, Illinois</u>, 506 U.S.56 (1992). In <u>Soldal</u>, the Court held that sheriff's deputies who stood by to "keep the peace" while Soldal's landlord effected an illegal eviction, and thereby prevented Soldal from exercising reasonable force to protect his property from seizure, may be liable for violating Soldal's Fourth Amendment rights. The court noted that a "seizure" of property occurs when "there is some meaningful interference with an individual's

possessory interests in that property." Id. at 61, quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984). In the present case, the actions of Deputy Tibbetts in forcing Barry Higgins to leave his residence under threat of arrest if he failed to do so constitutes a meaningful interference with his possessory interest in that property. See Thomas v. Cohen, 304 F.3d 563 (6th Cir. 2002)("Escorting tenants from their residences in the course of effectuating an eviction, as in this case, satisfies the requirement of 'meaningful interference' with their leasehold interest so as to amount to a seizure of their property."). As such, Deputy Tibbetts violated Barry Higgins's Fourth Amendment rights if the seizure was "unreasonable." Soldal, 506 U.S. at 71 ("reasonableness is still the ultimate standard under the Fourth Amendment").

(Pl.' Mot. Partial Summ. J. at 5-6.)  Thus, it is this "meaningful interference with his possessory interest" that is the seizure of which Higgins complains.[6]

The Thomas plaintiffs' Fourth Amendment claim is rather four-square with Higgins's claim (if his version of the facts is credited); the Thomas plaintiffs were ordered to leave a women's shelter at which they were rent-paying residents.  As to the plaintiffs' Fourth Amendment claim the leading opinion by Circuit Judge Clay reasoned:

> Forcible eviction of tenants, even if in a more peaceful or traditional manner than in Soldal, is by its very nature a meaningful interference with their possessory interests and is therefore no less a deprivation of their constitutional rights when carried out by law enforcement officers in the absence of a legal basis for doing so. The Soldal Court emphasized that " 'at the very core' of the Fourth Amendment 'stands the right of a [person] to retreat into [her] own home,' " id. at 61, 113 S.Ct. 538 (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)), thereby giving us every reason to regard the deprivation of Plaintiffs' possessory interests in their residence as a violation of the Fourth Amendment. To hold otherwise in the context now presented would constitute a departure from precedent. Indeed, we have previously found that mere damage to property inside a home may constitute a meaningful interference with possessory rights. See, e.g., Bonds v. Cox, 20 F.3d 697, 701-02 (6th Cir.1994) (holding that, under Soldal, damage to a house, including broken doors, mutilated vinyl siding,

---

[6]      The property interest allegedly seized by Tibbetts was not the property inside the building.  And Higgins does not argue that he was seized by the threat of arrest. Compare McCullah v. Gadert, 344 F.3d 655, 661 (7th Cir. 2003); White v. City of Markham, 310 F.3d 989, 992 -97 (7th Cir. 2002); Mellott v. Heemer, 161 F.3d 117, 124 -25 (3d Cir. 1998);  King v. Massarweh, 782 F.2d 825, 827-29 (9th Cir. 1986); Thomas v. Sheahan, Civ. No. 04-4865, 2005 WL 782693, *5 (N.D. Ill. April 5, 2005).

broken desks, and holes in walls, rises to the level of "meaningful interference" with one's possessory interests).

Finally, the seizure of Plaintiffs' possessory interest in their residence implicates the interests of privacy, security and liberty underlying the Fourth Amendment. See Thomas K. Clancy, What Does The Fourth Amendment Protect: Property, Privacy, or Security, 33 Wake Forest L. Rev 307 (1998); Morgan Cloud, The Fourth Amendment During the Lochner Era: Privacy, Property and Liberty in Constitutional Theory, 48 Stan. L. Rev. 555 (1996); William C. Heffernan, Property, Privacy, and The Fourth Amendment, 60 Brook. L. Rev. 633 (1994). First, a tenant has a privacy interest at stake in his or her leasehold. As the Court has stated, the legitimation of expectations of privacy must have a source outside the Fourth Amendment, either by reference to concepts of real or personal property or to understandings that are recognized and permitted by society. Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Because the right to exclude others is one of the main rights attaching to property, tenants in lawful possession of a home or apartment generally have a legitimate expectation of privacy by virtue of having a property interest in a specific piece of real estate. Further, tenants, like all people, enjoy the Fourth Amendment "right ... to be secure in their ... houses." The personal security of tenants is thus threatened when they cannot control their possessions free from unreasonable governmental inference, whether or not these possessions are characterized as real or personal property. Finally, the liberty interest of tenants in controlling their possessions and in being left alone in their own homes would be severely compromised if people were not free from unreasonable governmental interference.

Therefore, assuming that Plaintiffs in the instant case were residents of the Augusta House, it is clear that their possessory interests in their place of residence were meaningfully interfered with when the officers deprived Plaintiffs of their place of residence, thus effectuating a seizure within the meaning of the Fourth Amendment.

304 F.3d at 573-74 (footnote omitted).  However, although neither side to this dispute addressed this quirk about Thomas, one of Judge Clay's panel members doubted that there was a Fourth Amendment seizure, see Id. at 582-83 (Gilman, Cir. J. dissenting in part and concurring in part), and the other stated that "any Fourth Amendment right not to be evicted, if there is one, ha[d] not been demonstrated to be a seizure and ha[d] not yet been clearly established," id. at 583-84 (Wallace, Cir. J., "concurring in part [with Circuit Judge Gilman] and dissenting in part") (emphasis added).  See also Lunini v. Grayeb, 305

F.Supp.2d 893 (C.D. Ill. 2004) (court concluding on similar facts that there was a Fourth

Amendment violation), rev'd on other grounds, 395 F.3d 761 (7th Cir. 2005).[7]

The seizure of the residence in Soldal was a dramatic physical seizure and

removal of a mobile home. What the Soldal Court had to wrestle with was the reasoning

of the Seventh Circuit's decision and the Panel's conclusion that there was no Fourth

Amendment violation because the seizure was not made in the course of public law

enforcement and did not invade Soldal's privacy.  See 506 U.S. at 60, 67-68, 69.   The

Supreme Court did not have to determine if there could be a Fourth Amendment seizure

when there was no actual physical seizure of a tangible interest.  And in its conclusion the

Court distinguished the seizure before it from a typical landlord-tenant dispute:

> The complaint here alleges that respondents, acting under color of
> state law, dispossessed the Soldals of their trailer home by physically
> tearing it from its foundation and towing it to another lot. Taking these
> allegations as true, this was no "garden-variety" landlord-tenant or
> commercial dispute. The facts alleged suffice to constitute a "seizure"
> within the meaning of the Fourth Amendment, for they plainly implicate
> the interests protected by that provision.

Id. at 72.

---

[7]      The District Court in Lunini discussed Soldal in a factual pattern not dissimilar to Higgins's.
Lunini was a male cohabitant of a male city councilman who placed an emergency domestic violence call
and was rewarded with the responding police officers' directive to leave or risk arrest.  Lunini was ordered
to surrender his house key, garage opener, and gate opener, depriving him of access to his companion's
house where he had lived for two years.  Id. at 905 -06.  The District Court noted that there was a dispute
over Lunini's possessory interest but that no eviction action was underway and concluded that there was a
genuine dispute of material fact that he "was seized by being deprived of his access to the property."  Id. at
906.  The Seventh Circuit reversed the District Court on another claim, Lunini's class-of-one equal
protection claim premised on police failure to arrest Lunini's complaining housemate.  395 F.3d 761, 770-
72 (7th Cir. 2005).  The Panel noted that Lunini might be "unhappy with defendant police officers' response
to the incident" but concluded that "it appears highly doubtful that any alleged police misjudgments (if
misjudgments there were) took on constitutional proportions" and declined "to take the unprecedented step
of implying a general constitutional police duty to arrest certain individuals during a response to an isolated
domestic incident," as such a ruling "would threaten to turn every police house call into a potential federal
constitutional lawsuit"  Id. at 906. The District Court decision in Lunini contains a footnote indicating that
the court had previously ruled, on March 13, 2002, "that 'there existed clearly established law at the time of
this incident that a seizure occurs in the eviction context, and such action must comport with Fourth
Amendment protections.'" 305 F. Supp. 2d at 906 n. 8.  The referenced order is not available on the court's
electronic docket.

With respect to the physical, seizable nature of the property the Supreme Court noted:  "In holding that the Fourth Amendment's reach extends to property as such, we are mindful that the Amendment does not protect possessory interests in all kinds of property.  See, e.g., Oliver v. United States, 466 U.S. 170, 176-77 (1984).  This case, however, concerns a house which this Amendment's language explicitly includes, as it does a person's effects."  Id. at 544 n.7.  (Oliver concluded that the Framers did not intend the Fourth Amendment to extend to fields.  466 U.S. and 176-177.)  It should also be noted that the cases Soldal relies on in terms of the seizure of property protected by the Fourth Amendment were United States v. Jacobsen, 466 U.S. 109, 124-25 (1984) involving the seizure of  package of powder, and United States v. Place, 462 U.S. 696, 708 (1983) involving the seizure of a suitcase.  Soldal, 506 U.S. at 544.  In his opinion in Thomas, dissenting as to Circuit Judge Clay's determination on the Fourth Amendment claim, Circuit Judge Gilman emphasizes the difference between the physical seizures at issue in Jacobson and Soldal and the absence of a physical seizure of a tangible object in Thomas, see 304 F.3d at 582-83, a want also present in this record.

Not only did Tibbetts not assist in the placement of the garage/residence on a trailer for removal, he did not enter the residence to secure it or its occupants. Compare Tower v. Leslie-Brown, 326 F.3d 290, 296 - 97 (1st Cir. 2003).   And he did not take any steps apropos the exterior of the property to physically bar Tibbetts from re-entry.  For instance, compare Tibbetts's rather passive participation in Barry Higgins's ejection with the facts of Dixon v. Lowery, 302 F.3d 857 (8th Cir. 2002).  There the defendant officers arrived at the property in dispute, the Big Mamou, in a marked car, uniformed, and armed, and stood watch while the person claiming rights superior to the plaintiff's

changed the locks, entered the restaurant, helped clear employees, <u>taking possession of the key and locked the premises</u>. <u>Id.</u> at  862 -66.  The officer/defendants remained at the premises and were on site when the plaintiff returned, at which point the officer defendants told him that he would be kicked out again. <u>Id.</u> at 865-66.  Furthermore, the Eighth Circuit described how the officer "commandeered the facility themselves," undertaking a "'round-the-clock occupation,'" noting that "when an employee attempted to turn a big screen television off, one officer is alleged to have said 'no you just leave that on, we're going to make ourselves at home, we're going to be staying here at night. And we're going to make ourselves at home.'"  <u>Id.</u> at 866 -67.  "The officers," the Panel noted,  "continued to occupy the Big Mamou until Dixon filed suit and their superiors ordered them to terminate their employment at the Big Mamou--a period of more than three weeks." <u>Id.</u>;  <u>compare</u> <u>also</u> <u>Armendariz v. Penman</u>, 75 F.3d 1311, 1320 (9th Cir. 1996) (concluding that a Fourth Amendment-- and not a substantive due process -- claim was possible vis-à-vis allegations a city summarily closed ninety-five buildings over a six-month period, evicting the tenants and driving them to other parts of the city, and boarding the buildings up); <u>Open Inns, Ltd. v. Chester County Sheriff's Dept.</u>, 24 F.Supp.2d 410, 416, 421 (E.D. Pa. 1998) (defendant officers assisted in the repossession of a hotel, staying on the premises for two hours while the repossessors secured offices and maintenance areas, took an inventory of supplies (with the assistant of one of the offices, conduct the court described as neither brief nor passive), and took possession of assets).  And, by ordering Barry Higgins to leave, Tibbetts did not effect any legal change in whether or not Higgins actually had a tenancy interest under Maine law.[8]  In short, I

---

[8]        Such an order for a tenant or house owner to leave his residence is not uncommon in other law enforcement contexts, such as when police respond to "garden variety," <u>Soldal</u>, 506 U.S. at 72, domestic

am doubtful, even if Barry Higgins can prove that he had some possessory interest in the property and that Tibbetts knew about that claimed possessory interest, that Tibbetts could be held accountable for a Fourth Amendment violation for ordering Higgins to leave.  See Thomas, 304 F.3d at 582 -583 (Gilman, Cir. J., concurring in part and dissenting in part) (voicing disagreement with the lead opinion's conclusion that there was a Fourth Amendment violation); id. at 583-84 (Wallace, Cir. J.) ("concurring in part, dissenting in part") (expressing skepticism that there was a Fourth Amendment violation).

But even if I am incorrect on this score, the first step in establishing a Fourth Amendment violation is to determine whether or not Higgins even had a possessory interest in the property because if he does not (and Tibbetts was right to view him as a trespasser) then there was no right to be interfered with. See cf. Gentry v. City of Lee's Summit, Mo., 10 F.3d 1340, 1345 (8th Cir. 1993) (analyzing the issue apropos a Fourteenth Amendment claim, concluding that a dispute of the facts material to this question precluded summary judgment in the City's favor). The facts set out above make it crystal clear that there is a genuine dispute of the facts material to this determination.[9] And, even assuming that Higgins had some sort of legally cognizable right to be on the premises, there are also disputed facts on the question of whether or not Tibbetts nonetheless acted reasonably within the meaning of the Fourth Amendment in ordering

---

abuse incidents.
[9]      According to the defendants Barry Higgins is seeking a state court adjudication of the propriety of his eviction, an action – BANSC-RE-2002-39 – which they state is currently pending.  (See Defs.' Mot. Summ. J. at 6 n.2.)

Higgins to leave. See Tower, 326 F.3d at 296 - 97.[10]

***Fourteenth Amendment Claim***

Vis-à-vis his Fourteenth Amendment claims Higgins argues:

It is well-established that possessory interests in property invoke procedural due process protection. See Fuentes v. Shevin, 407 U.S. 67, 87 (1972). At the core of procedural due process jurisprudence is the right to advance notice of a significant deprivation of liberty or property, and to a meaningful opportunity to be heard prior to that deprivation. See LaChance v. Erickson, 522 U.S. 262 (1998); Boddie v. Connecticut, 401 U.S. 371 (1971).

In a factually similar case, the Third Circuit Court of Appeals held that a police officer who assisted a private party in taking possession of a van from her former husband in a dispute over ownership of the van violated the former husband's right to procedural due process. The court explained:

At the heart of Fuentes [supra] is the principle that it is not for law enforcement officers to decide who is entitled to possession of property. Rather, it is the domain of the courts, and citizens are to have a meaningful opportunity to be heard as to their rights before they are finally deprived of possession of property. Diehl's curbside courtroom, in which he decided who was entitled to possession, is precisely the situation and deprivation of rights to be avoided.

Abbott v. Latshaw, 164 F.3d 141, 149 (3[]d Cir. 1998). See also Thomas v. Cohen, 304 F.3d at 578 (holding that tenants had a right to procedural due process before being evicted and that officer's actions in removing tenants without a court order of eviction violated their Fourteenth Amendment rights). The present case is indistinguishable from those cases, and Deputy Tibbetts violated Barry Higgins' right to due process as a matter of law when he forced him to leave the premises without any pre-deprivation notice or opportunity to be heard.

(Pl.'s Mot. Summ. J. at 8.)

For their part, the defendants argue that Higgins's Fourteenth Amendment claim is barred because Higgins has an adequate post-deprivation remedy under 14 M.R.S.A. § 6014, at the same time acknowledging that an action under this title could not be brought against Tibbetts. (Defs.' Obj. Mot. Summ. J. at 3-4 & n.3.) They argue that

---

[10] The defendants have not pressed a qualified immunity defense vis-à-vis this motion; they do assert that Tibbetts is entitled to the defense in their own motion for summary judgment.

Tibbetts's conduct was the kind of random and unauthorized action that falls under the Parratt v. Taylor, 451 U.S. 527 (1981) and Hudson v. Palmer, 468 U.S. 517 (1984) doctrine and such post-deprivation proceeding was all the process Higgins was due. (Id. at 3.) See Mard v. Town of Amherst, 350 F.3d 184, 193 (1st Cir. 2003) ("Under the so-called Parratt/Hudson doctrine, due process is not violated where the deprivation is caused by the random and unauthorized conduct of state officials and where the state provides adequate post-termination procedures.").

   With respect to Fourteenth Amendment procedural due process analysis, responding to a trespass/disputed eviction is not a random and unpredictable situation, and Tibbetts's alleged failure to assure that Leo had the authority to order Barry off the premises does not, in my reading of the law, make his action the kind of random and unauthorized action that falls under the Parratt/Hudson doctrine relied on by the defendants. In Zinermon v. Burch the Court explained that,"the reasoning of Parratt and Hudson emphasizes the State's inability to provide predeprivation process because of the random and unpredictable nature of the deprivation, not the fact that only property losses were at stake." 494 U.S. 113, 132 (1990). "In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking." Id. The First Circuit has cautioned: "The Parratt-Hudson-Zinermon trilogy 'requires that courts scrutinize carefully the assertion by state officials that their conduct is "random and unauthorized" ... where such a conclusion limits the procedural due process inquiry under § 1983 to the question of the adequacy of state postdeprivation

remedies." Brown v. Hot, Sexy and Safer Productions, Inc., 68 F.3d 525, 536 (1st Cir.1995) (quoting Lowe v. Scott, 959 F.2d 323, 341 (1st Cir.1992)).

I do recognize that some circuits have concluded that if there is an established pre-deprivation process provided for in a state law or a policy then any state actor who does not follow these procedures is acting in a random and unauthorized manner and, thus, the due process violation is not actionable.  See  Tinney v. Shores, 77 F.3d 378, 381-82 & n.1(11th Cir.1996) (asking, in a challenge to an attachment, whether the state can anticipate and therefore control the action of a state employee, observing that once a state has established procedures for the effectuation of an attachment it cannot predict whether or not, in a given situation, those procedures will be followed or ignored, concluding that an employee's negligence or an employee's intentional wrongful act, were not preventable beforehand by the state); Reese v. Kennedy, 865 F.2d 186, 187 -88 (8th Cir. 1989) ("To the extent that Reese argues that appellees did not follow existing eviction procedures, Parratt provides that a due process deprivation does not occur because of an unauthorized failure of state officials to follow established state procedures. Absent a due process challenge to the state procedures themselves, Reese has failed to state a procedural due process claim) (citations omitted); Wilson v. Civil Town of Clayton, 839 F.2d 375, 378, 380-83 (7th Cir. 1988) (town marshals who evicted customers and employees from "the Poverty Shop," an establishment owned by plaintiff, did not do so according to an official town policy (or custom) and therefore their action were random and unauthorized under Parratt); King v. Massarweh, 782 F.2d 825, 826 -27 (9th Cir. 1986) ("The conduct [evicting tenants, taking them and property into custody] of the defendant police officers here appears to have been random and

unauthorized. The officers acted in response to landlord's call. They did not act in

accordance with established state procedures but instead acted in violation of police

procedures promulgated by the San Francisco Police Department.").[11]  If one were to

follow this line of cases there could be no remedy for individual instances of the

improper denial of pre-deprivation process except for in cases where the law, policy, or

custom is infirm under the Fourteenth Amendment.  See Winters v. Board of County

Com'rs, 4 F.3d 848, 856 -57 (10th Cir. 1993) (addressing the inappropriate disposition of

a ring by a sheriff's department in contravention of a state statute which established pre-

deprivation procedures, concluding that the sheriff's department could not ignore those

procedures on the grounds that post-deprivations remedies were to be had); see also

Thomas, 304 F.3d at 576 ("The government's interest in enforcing a landlord's

unauthorized directives pales in comparison to the importance of Plaintiffs' interest in

maintaining possessory rights to their place of residence. Therefore, postdeprivation

remedies of any sort would be inadequate.").

---

[11]     In a case involving the seizure of the plaintiff's driver license, the District Court in Fox v. Van
Oosterum reasoned:

> Plaintiff contends that, despite the fact that the state officials' actions in
> withholding plaintiff's license were taken without legal authority, he was nevertheless
> entitled to predeprivation process. Arguing that the deprivation was caused by a state
> custom or policy of failing to train, discipline and supervise its employees, plaintiff
> asserts that defendants' actions may not be considered random and unauthorized. This, he
> claims, means that under Parratt he is entitled to predeprivation process.
>     While plaintiff's basic premise is correct--that actions taken in accordance with a
> state custom or policy are not unauthorized--his procedural due process claim fails
> because he has not articulated such a policy. As previously discussed, plaintiff has failed
> to provide the Court with facts demonstrating a need for more or different training.
> Because the policymakers could not have anticipated the random act of a state employee
> in this isolated set of circumstances, predeprivation process was impossible. See Parratt,
> 451 U.S. at 541. Thus, defendants Hartrum and Van Oosterum's actions, even if
> intentional, are considered random and unauthorized for the purpose of this inquiry and
> plaintiff's claim will fail unless he pleads and proves that the state remedies available to
> him were inadequate. Copeland v. Machulis, 57 F.3d 476, 478 (6th Cir.1995) (citing
> Hudson v. Palmer, 468 U.S. 517, 531-33 (1984) and Parratt, 451 U.S. at 543-44.).

987 F.Supp. 597, 604 -05 (W.D. Mich. 1997).

The contours of the pre-deprivation process due precedent to Tibbetts's participation in Barry Higgins's temporary removal from the premises has not been precisely elucidated by either party.  According to Higgins the pre-deprivation process Tibbetts could have provided was assuring that there was a valid writ of possession or, at least, the undertaking of a proper investigation of the disputed ownership interest. See Kelley v. LaForce, 288 F.3d 1, 7 n.3 (1st Cir. 2002).   In Kelley, the First Circuit appeared to acknowledge the viability of a Fourteenth Amendment due process claim brought by a plaintiff who claimed to have an interest in a pub who was evicted from the premises with the assistance of police officers. 288 F.3d at 4 -9 & n.4 (not mentioning post-deprivation remedies but addressing several contemporaneous state law claims arising from the same conduct and noting in a footnote that "[i]t is unclear exactly which constitutional right appellants believe was violated," but for the sake of "clarity" proceeding as though a due process claim were alleged).[12]  The First Circuit noted that defendants claimed that they believed that the employee of the plaintiff that they evicted was no more than a trespasser rather than that they were confiscating any property interest, id. at 8,[13]  as is Tibbetts's story here.

Barry Higgins asserts that he told Tibbetts that he had a possessory right to be on the property and, if this allegation is true, the pre-deprivation "safeguard" of assuring that

---

[12]     This is not the conventional type of pre-deprivation notice and opportunity-for-a-hearing process situation.  If it were not for Kelley I might pause long and hard before assuming that the Fourteenth Amendment is even implicated by an officer's peacekeeping presence during /participation in an eviction. At least one Circuit Court Judge has questioned whether having an officer situated as Tibbetts attempt to verify competing claims of ownership would violate the procedural protections of the Fourteenth Amendment.  See Marcus, 394 F.3d at 828 (Brorby, Sen. Cir. J., dissenting) (noting also that the competing claims of ownership were still not resolved at the time of appeal).   Imposing this kind of constitutional duty to preside over a curbside-courtroom on law enforcement personnel untrained in this area is a very valid concern in my view.  Absent the erection of this curbside courtroom, what sort of predeprivation process can an officer afford in this sort of situation when called upon to prevent a perceived breach of the peace ?

[13]     Kelley himself was not at the property but was incarcerated on an unrelated charge. Id. at 5.

Leo had a proper eviction order would potentially have substantial "value in preventing an erroneous deprivation of the protected interest." Mard, 350 F.3d at 193; see also Zinermon, 494 U.S. at 132-33 ("In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking."); Fuentes v. Shevin, 407 U.S. 67, 81-82 (1972) ("If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented. At a later hearing, an individual's possessions can be returned to him if they were unfairly or mistakenly taken in the first place. Damages may even be awarded to him for the wrongful deprivation. But no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred.").   The problem with applying this line of cases to the type of situation at issue in Kelley or in this case, is that an officer responding to a citizen's call cannot be expected to provide notice and an opportunity for a hearing to all the interested parties. In the final analysis the officer is going to be called upon to make an onsite determination vis-à-vis competing claims of rights.  If his conclusion about one side or the other's legal rights turn out to be incorrect, the officer will have violated that party's constitutional right to due process without anyone ever being called upon to explain exactly what process it was that was due the complaining party.  While I have already expressed my concern regarding the viability of a Fourth Amendment claim on these facts, to accept that Higgins's version of the facts supports a Fourteenth Amendment claim seems to me to be even more implausible.  However, in light of Kelley I will accept that a Fourteenth Amendment due process constitutional violation is made out when a police officer has

been told by an alleged "trespasser" that the person is a lawful tenant and the officer then fails to make some further (unspecified) inquiry into the legitimacy of the 'tenant's' claim.

The bottom line apropos this motion, however, is whether or not Higgins was entitled to some sort of pre-deprivation process from Tibbetts: "The threshold issue in a procedural due process action is whether the plaintiff had a constitutionally protected property interest at stake." Mard, 350 F.3d at 188 -89 (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538-41 (1985) and Bd.of Regents v. Roth, 408 U.S. 564, 576-78 (1972)); see also Fuentes, 407 U.S. at 84 ("The right to a prior hearing, of course, attaches only to the deprivation of an interest encompassed within the Fourteenth Amendment's protection."); Woofhaus, Inc. v. Inhabitants of Town of Old Orchard Beach, Civ. No. 00-353, 2001 WL 501048, *7 (D. Me. 2001) ("In order to establish a procedural due process claim under § 1983, [a plaintiff] must allege first that it has a property interest as defined by state law and, second, that the defendants, acting under color of state law, deprived it of that property interest without constitutionally adequate process. PFZ Props., Inc. v. Rodriguez, 928 F.2d 28, 30 (1st Cir.1991). Here, the plaintiffs' claim founders on the first requirement.").  As stated with respect to the Fourth Amendment claim, this record is fertile with disputes as to the facts material to this inquiry.

### Conclusion

For these reasons I recommend that the Court **DENY** Barry Higgins's motion for partial summary judgment.

<u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

Dated:  June 2, 2005.                    /s/ Margaret J. Kravchuk
                                         U.S. Magistrate Judge