UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| BARRY HIGGINS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 04-157-B-W |
| | ) | |
| PENOBSCOT COUNTY SHERIFF'S | ) | |
| DEPARTMENT, et al. | ) | |
| | ) | |
| Defendants | ) | |

***RECOMMENDED DECISION ON MOTION FOR
JUDGMENT ON THE PLEADINGS AND FOR SUMMARY JUDGMENT and
ORDER ON MOTION TO STRIKE***

This is an action brought by Barry Higgins stemming from his ejection from family-owned property in Carmel, Maine.  The defendants, Penobscot County Sheriff's Department, Glen Ross, and Joshua Tibbetts, move for judgment on the pleadings vis-à-vis one state law count and for summary judgment apropos the remaining three counts. (Docket No. 16.)  Higgins has also filed a motion to strike the defendants' reply to his response to their statement of fact.  (Docket No. 35.)  I now **GRANT** the motion to strike the reply to the responsive statement of  fact, but **DENY** that portion of the motion which seeks to strike the second Ross affidavit, which can properly be used in support of the facts adduced by defendants.

For the reasons articulated below, I recommend that the Court grant the defendant judgment on the pleadings with respect to that one state law count and grant them summary judgment as to the other two state law claims.  Regarding the 42 U.S.C. § 1983

count, premised on the Fourth and Fourteenth Amendments,[1] I also recommend that the court grant the motion on the basis of qualified immunity as against Tibbetts, the defendant who was personally involved in the events at the property.  I further recommend the court grant summary judgment as to the Penobscot County Sheriff's Department and Penobscot County Sheriff Glen Ross on Higgins's Fourth and Fourteenth Amendment custom and policy and failure to train claims.

*Discussion*

**Complaint Allegations**

Barry Higgins presses four counts in this removed civil action against the Penobscot County Sheriff's Department, Ross, and Tibbetts:  In Count I Higgins asserts that the defendants ran afoul of 14 M.R.S.A. § 6014 when Tibbetts, acting in concert with Higgins's father, Leo Higgins,  evicted him from property in Carmel, Maine.  In Count II Higgins claims that Tibbetts converted his property.  In Count III, Higgins asserts that Tibbetts's conduct vis-à-vis his eviction caused him emotional distress.  And, in Count IV Higgins alleges that the defendants violated his (Fourth and Fourteenth Amendment) rights under the United States Constitution when Tibbetts ordered Brian Higgins to leave his home and by doing so without affording Higgins pre-deprivation due process.  In this count Higgins asserts that Sheriff Ross and the Penobscot County Sheriff's Department are liable for failing to adequately train or have in place a policy that would have prevented this wrongful civil eviction.

---

[1]	In his complaint Higgins states that Tibbetts deprived him of "his property and civil right to live in and occupy his home, in violation of 42 U.S.C. § 1[9]83."  In his own motion for summary judgment, Higgins moves for judgment on this count and articulates this claim as being brought for a violation of his Fourth Amendment right to be free from an unreasonable seizure and his Fourteenth Amendment right to procedural due process.  (See Mot. Partial Summ. J. at 5-8, Docket No. 14.)

***Motion for Judgment on the Pleading Standard***

Federal Rule of Civil Procedure 12(c) permits any party to move for judgment on the pleadings.  "Judgment on the pleadings under Rule 12(c) may not be entered unless it appears beyond a doubt that the nonmoving party can prove no set of facts in support of her claim which would entitle her to relief." Feliciano v. Rhode Island, 160 F.3d 780, 788 (1st Cir.1998) (citations omitted); accord  McCord v. Horace Mann Ins. Co., 390 F.3d 138, 141 (1st Cir. 2004).

***Summary Judgment Standard***

With respect to summary judgment the defendants are entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [they are]  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to Higgins, the nonmoving party, and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation.  Merchants Ins. Co. v. U. S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).  If such facts and inferences could support a favorable verdict for Higgins, then there is a trial-worthy controversy and summary judgment must be denied.  ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

*Material Facts*

### Facts Regarding May 16, 2002

There is   no dispute that on May 16, 2002, Joshua Tibbetts, a deputy sheriff with the Penobscot County Sheriff's Department, was dis patched to respond to a complaint in Carmel, Maine, at the real estate that is the situs of the events leading to this lawsuit. (Defs.' SMF ¶ 1; Tibbitts Aff. ¶ 2.)

There is a dispute over the content of the communication between Barry Higgins and Tibbetts apropos Barry's right to be on the premises.  Barry Higgins asserts that he placed the call to Tibbetts, told him that he lived on the property, and told him that there was a dispute over his continued right to do so.  (Pl.'s SAMF ¶ 35; Pl.'s RSMF ¶¶ 2,3, 12; Higgins Aff. ¶ 16; Tibbetts Tr. at 3.)   He says that it was discussed with Tibbetts that Barry and his father had been in a partnership together and that there was now this dispute brewing.  (Pl.'s SAMF ¶ 35; Tibbetts Tr. at 4.)

The defendants reply that Tibbetts was told by Barry Higgins that there was a dispute over items of personal property located in the building on the real estate in question but that Tibbetts was not told that there was a dispute over Barry Higgins's right to be on the property or that Barry claimed that he was a tenant.  (Defs.' Reply Pl.'s SAMF ¶¶ 35, 36; Tibbetts Aff. ¶¶ 2-6, 12, 17-21; Tibbetts Tr. at 6, lines 22, 23; Irene Higgins Aff. ¶ 11.)  The defendants assert that Tibbetts was told by Barry Higgins that the property in question was owned by his father, Leo Higgins.  (Defs' SMF ¶ 2; Tibbetts Aff. ¶ 3.)  The defendants contend Barry Higgins told Tibbetts that Barry lived on the property previously, but had moved off several years before. (Defs.' SMF ¶ 7; Tibbitts Aff. ¶ 7.)  Tibbetts states that he asked Barry Higgins for his address, but the Barry would

not provide it.   (Defs.' SMF ¶ 14; Tibbitts Aff. ¶ 16.)   And, Tibbetts claims that Barry

was "driving" a truck with Connecticut license plates on it. (Defs.' SMF ¶ 15; Tibbitts

Aff. ¶ 17.)  According to the defendants neither Barry Higgins nor Leo Higgins told

Tibbetts that there was any issue or dispute over Barry residing at the property. (Defs.'

SMF ¶ 12; Tibbitts Aff. ¶ 23.)

     According to defendants, Barry Higgins told Tibbetts that he owned certain items

of personal property that were located on the property in one of the buildings on the

property and that he told Tibbetts that he wanted to retrieve certain items of personal

property he claimed were in the building that was on the property.   (Defs.' SMF ¶¶ 1, 6;

Tibbitts Aff. ¶ 6.)   Tibbetts allowed Barry Higgins to retrieve some items of personal

property from inside of the building. (Defs.' SMF ¶ 13; Tibbitts Aff. ¶ 14.)

     Barry Higgins asserts that after Tibbetts told him to leave Barry Higgins protested

that he had personal property there that he was concerned would be taken if left

unattended.  (Pl.'s RSMF ¶¶ 3,6; Higgins Aff. ¶¶ 16, 19, 21, 24; Higgins Dep. at 72.)

Barry says that Tibbetts told him he had five minutes to get his belongs and leave or he

would be arrested. (Pl.'s RSMF ¶¶ 13; Higgins Aff. ¶ 21.)   He states that when he left he

took some papers and some clothes and a suitcase with him.  (Pl.'s SAMF ¶ 37; Tibbetts

Tr. at 8.)[2]  With respect to Tibbetts's assertion that he was "driving" a truck, Higgins

retorts that he was in his residence in his robe having coffee when Tibbetts arrived.  (Pl.'s

RSMF ¶¶ 15; Higgins Dep. ¶ 15.)

---

[2]     Higgins states that David Prescott and Irene Higgins went in to the apartment on the property after
Barry was forced to leave.  The apartment contained household items such as a couch, stove, refrigerator,
beds, chair, clothes, appliances, telephone, answering machine, fax and printer.  (Pl.'s SAMF ¶ 39; Prescott
Dep.  at 13,24; Irene Higgins Dep. at 27-28.)  The defendants object to this statement arguing that the facts
are immaterial as there is no evidence that Tibbetts had any knowledge of these facts.  I agree that this
paragraph is not relevant to Higgins's self-framed claims against these defendants.

The following facts are undisputed.  Barry Higgins told Tibbetts that Barry Higgins had previously had a partnership with his father that involved the real estate and the property.   (Defs.' SMF ¶ 4; Tibbitts Aff. ¶ 5.)  Irene Higgins, Barry's sister, was also present and stated that she did not want Barry to remove any items of personal property. (Defs.' SMF ¶ 7; Tibbitts Aff. ¶¶ 8, 9.) During the discussion between Tibbetts, Barry Higgins, and Irene Higgins, Leo Higgins arrived. (Defs.' SMF ¶ 8; Tibbitts Aff. ¶ 10.) Leo Higgins told Tibbetts that he had previously notified Barry Higgins that he should not be on the property. (Defs.' SMF ¶ 9; Tibbitts Aff. ¶ 11.) Leo Higgins showed Tibbetts a deed to the property that was in his name. (Defs.' SMF ¶ 10; Tibbitts Aff. ¶ 12.)  Leo Higgins told Tibbetts that there was a dispute between Barry and Leo about various items of personal property, such as tractors and excavation equipment, and that a lawyer was involved.  (Defs.' SMF ¶ 11; Tibbitts Aff. ¶ 13.)  Tibbetts issued Barry Higgins a no-trespass notice.  (Defs.' SMF ¶ 16; Tibbitts Aff. ¶ 15.)

Barry Higgins asserts that Tibbetts has no experience with civil evictions, received no training in civil evictions, and is not familiar with the forcible entry and detainer process.  (Pl.'s SAMF ¶ 38; Tibbetts Tri. at 6, 10.)  The defendants respond that Tibbetts was not involved with the civil proceeding, civil eviction, or a forcible entry and detainer; Tibbetts was responding to a criminal complaint for an illegal trespass and issued a no-trespass notice informing Barry Higgins that he would be subject to criminal sanctions in the event that he violated the terms of the notice. (Defs.' Resp. Pl.'s SAMF ¶ 38; Tibbetts Aff., ¶¶ 2, 11, 15.)

**Facts Regarding Tibbetts's General Belief that the Building Was Vacant**

According to the defendants, Tibbetts believed that the building that is the subject of this lawsuit was vacant and that neither Barry Higgins nor anybody else resided there. (Defs' SMF¶ 17; Tibbetts Aff. ¶¶ 6, 7, 11, 13, 17, 23.)  He relied on the following observations in forming this belief.  There were no stairs to allow one to gain entry to the building, but only a ladder.  (Defs' SMF¶ 18; Tibbetts Aff. ¶ 19.)  Tibbetts had driven by the building on many occasions before and it had always appeared to him to be vacant. (Defs' SMF¶ 19; Tibbetts Aff. ¶ 20.)  When Tibbetts had observed the building previously, he never saw any activity in the building, such as doors or windows open, or lights on. (Defs' SMF ¶ 20; Tibbetts Aff. ¶ 21.)  When Tibbetts had observed the building previously there were a number of items in the dooryard to the building that were always in the same place and he never saw vehicles in the dooryard.  (Defs' SMF¶ 21; Tibbetts Aff. ¶ 22.)

Higgins retorts that he had lived at the property since 1981 and reiterates that he told Tibbetts that there was a dispute over the ownership of the property and his right to reside at the property.  (Pl.'s RSMF ¶ 17; Higgins Aff. ¶¶ 4,16.)  He states that he received his mail at the property until May 2002, when the mailbox lock was changed, that he kept his tools and equipment in the garage, kept his vehicles registered at that address, maintained --   and still maintains to this day -- telephone service at the property, and that, to this day, has the electrical services in his name, with Barry paying the bill each month.  (Pl.'s RSMF ¶ 19; Higgins Dep. at 14, 24, 46, 48, 50-51.)

***Identity of the Penobscot County Sheriff's Department Final Decision Maker and the
Motion to Strike***

According to the defendants the Sheriff of Penobscot County is Glenn Ross
(Defs.' SMF ¶ 22; 1st Ross Aff. ¶ 1) and, as Sheriff, Ross is the final decision maker with
respect to all operational matters involving the Penobscot County Sheriff's Department
(Defs.' SMF ¶ 23; 1st Ross Aff. ¶ 2).  Higgins qualifies the latter assertion by stating that
Ross has only been the final decision maker since he became Sheriff in October 2002
(months after the incident in question).  (Pl.'s RSMF ¶ 23; 1st Ross Aff. ¶ 1.)

Apparently in response to Higgins's qualification, the defendants have filed a
reply statement of material facts and a second affidavit by Ross.  This affidavit avers that
prior to Ross's appointment as the Sheriff of the Penobscot County upon the death of
Sheriff Edward Reynolds, Ross was the Chief Deputy Sheriff of Penobscot County, a
position he assumed on October 27, 1994.  (2d Ross Aff. ¶ 2.)  Ross avers that all the
information in his first affidavit was known to him during his tenure as Chief Deputy
Sheriff, although he was not the final decision maker until his appointment.  (Id. ¶ 3.)

For his part Higgins has filed a motion to strike the reply statement of fact and
the second affidavit. And Higgins is absolutely right that this effort by the defendants to
reply to the nonmovant's responsive statement of facts is not permitted under Local Rule
56. The portions of that pleading that reply to the responsive statements of fact are
stricken.  The statements responding to Higgins's additional statement of fact are properly
before the court.   However, I will not strike the second affidavit of Ross.  In view of the
fact that Reynolds is deceased, Ross is perhaps the most appropriate witness vis-à-vis
what were the policies, customs, and training during the times relevant to Higgins's
complaint.  See Fed. R. Evid. 901(b)(1).  I will consider the two Ross affidavits as proper

record support vis-à-vis the following factual assertions on policies, customs, and training.

### Policies and Customs Regarding Evictions

It is undisputed that there is no officially promulgated policy of the Penobscot County Sheriff's Department which permits or requires deputies to remove or evict an individual from real estate or buildings when the deputy knows that the individual is a tenant and that there is a civil dispute between the tenant and the landlord. (Defs' SMF ¶ 24; 1st Ross Aff. ¶ 8.) Other than this particular case, there have been no prior occasions under which there have been allegations that any employee of the Penobscot County Sheriff's Department has illegally, unlawfully, or wrongfully required one person to leave the property or building of another. (Defs' SMF ¶ 25; 1st Ross Aff. ¶¶ 5,6.)

### Training

There is no genuine dispute that all deputy sheriffs employed by the Penobscot County Sheriff's Department, including Tibbetts, receive training and law enforcement certification from the Maine Criminal Justice Academy. (Defs' SMF ¶ 26; 1st Ross Aff. ¶ 2.)  In addition to training from the Criminal Justice Academy, the Penobscot County Sheriff's Department periodically provides training to its deputies, including training that is required by the Criminal Justice Academy. (Defs' SMF ¶ 27; 1st Ross Aff. ¶ 3.)[3] Because there have never been any problems, complaints, or allegations regarding

---

[3]     The defendants assert that the Criminal Justice Academy does not require any training on the issue of landlord/tenant disputes, or training as to under what circumstances a deputy can or cannot issue a no-trespass notice requiring one person to leave the land or property of another person, other than training that may have been provided by the Academy itself.  (Defs' SMF ¶ 28; 1st Ross Aff. ¶ 4.)  Higgins moves to strike this statement on the grounds that Ross has not laid the foundation to show that he has personal knowledge of the requirements of the Maine Criminal Justice Academy.  I can easily envision a line of questioning that would establish Ross's personal knowledge of this training.  Higgins does not indicate that he has any factual basis for challenging Ross's personal knowledge vis-à-vis this statement.   However this fact is not determinative of the direction of my recommendation.

Penobscot County deputies unlawfully or wrongfully requiring one person to leave the property of another, the Sheriff's Department has never perceived or known that there was any need for training in that area. (Defs' SMF ¶ 29; 1st Ross Aff. ¶¶ 5,6.)

With respect to training, Higgins asserts that four copies of the Maine Sheriffs' Association Maine Civil Process Manual were shipped to the Penobscot County Sheriff's Office on April 26, 1996. (Pl. SAMF ¶ 40; Phillips Aff. ¶ 3.)[4]  In his Memorandum of law opposing summary judgment he explains the purpose of this qualifying statement. He states that Tibbetts admitted that he had no experience with civil eviction, received no training in civil evictions, and was not familiar with forcible entry and detainer process. (Pl.'s Mem. Opp'n Summ. J. at 5 & n.2.) Higgins believes that the fact that, six years prior to the incident, the Sheriff's office received four copies of this manual that "included a section on forcible entry and detainer and expressly cautioned about engaging in illegal evictions" precludes summary judgment for the defendants. (Id. at 5 n.2.)  However, the affidavit in support of this information about the manual only supports the assertion that the office received this manual.[5]

***County Liability Insurance***

The Maine County Commissioners Association Self-Funded Risk Management Pool (Risk Pool) is a public self-funded pool established pursuant to 30-A M.R.S.A. ch. 117.   (Defs' SMF ¶ 31; Ulmer Aff. ¶ 2.)  Penobscot County is a Named Member of the Risk Pool and is provided with insurance-type coverage pursuant to a document entitled

---

[4]    The defendants object on relevance ground to this assertion.

[5]    According to the defendants, on or about June 10, 1993, Leo Higgins issued a no trespass notice prohibiting Barry Higgins from being on his property.  (Defs' SMF ¶ 30; Ex A.)  Higgins denies this assertion and moves to strike it on the grounds that the exhibit is hearsay and has not been qualified as a business record. The qualification that there is no evidence that Tibbetts was aware of this notice is legitimate.  In my opinion, this prior no-trespass order is not outcome determinative considering the other disputed facts about the status of Barry Higgins's possessory interest.

"Maine County Commissioners Association Self-Funded Risk Management Pool Coverage Document."  (Defs' SMF ¶ 32; Ulmer Aff. ¶ 3; Collins Aff. ¶ 3.)   The Coverage Document specifically excludes any coverage for any cause of action seeking tort damages for which the County is immune pursuant to the Tort Claims Act, and limits coverage to those areas for which governmental immunity is expressly waived by the Tort Claims Act. (Defs' SMF ¶ 33; Ulmer Aff. ¶¶ 4-7.)[6] Other than the insurance-type coverage provided to Penobscot County under the Risk Pool's Coverage Document, Penobscot County has not procured insurance against liability for any claim against the County or its employees for which immunity is not otherwise waived under the Maine Tort Claims Act. (Defs' SMF ¶ 34; Ulmer Aff. ¶ 8; Collins Aff. ¶ 4.)

***The Claims***

### Count I: 14 M.R.S.A. § 6014

I conclude that the defendants are entitled to judgment on the pleadings as to Higgins's count that attempts to hold them liable under the illegal eviction statute directed at a landlord's conduct.  Section 6014 of title 14 provides:

> **Illegal evictions.** Except as permitted by Title 15, chapter 517 or Title 17, chapter 91,  evictions that are effected without resort to the provisions of this chapter are illegal and against public policy. Illegal evictions include, but are not limited to, the following.
>> **A.** No landlord may willfully cause, directly or indirectly, the interruption or termination of any utility service being supplied to the tenant including, but not limited to, water, heat, light, electricity, gas, telephone, sewerage, elevator or refrigeration, whether or not the utility service is under the control of the landlord, except for such temporary interruption as may be necessary while actual repairs are in process or during temporary emergencies.

---

[6]     Higgins qualifies this statement by citing, en gross, to Exhibit A of the Ulmer affidavit which is the four page coverage certificate.  Higgins offers no explanation of what the nature of his qualification might be.

**B.** <u>No landlord</u> may willfully seize, hold or otherwise directly or indirectly deny a tenant access to and possession of the tenant's rented or leased premises, other than through proper judicial process.

**C.** <u>No landlord</u> may willfully seize, hold or otherwise directly or indirectly deny a tenant access to and possession of the tenant's property, other than by proper judicial process.

14 M.R.S.A. § 6014(1) (emphasis added). In response to the defendants' argument that Tibbetts cannot be reached under this title because he is not the landlord of the property in question, Higgins argues that he can be liable on a principal and agent theory.

Higgins apparently did not pause to consider the logic of his principal/agent argument. He contends that because his complaint alleges that Tibbetts, "acting as agent for and at the behest of Leo Higgins, wrongfully evicted Plaintiff from his home of more than twenty years," the court must conclude that "Tibbetts may be held liable as the agent of Plaintiff's landlord, Leo Higgins." (Pl.'s Mem. Opp'n Mot. Summ. J. at 2.) In one of the cases relied on by Higgins, <u>Coweley v. Dubec</u>, 430 A.2d 549 (Me. 1981), the principal was a wife and the agent was her husband and the plaintiff sought to hold the wife liable for the conduct of her husband. 420 A.2d at 552. The other, <u>County Forest Products, Inc. v. Green Mountain Agency, Inc.</u>, 2000 ME 161, 758 A.2d 59, concluded that an insurance broker was the agent of the insurers. 2000 ME 161, ¶¶ 21-24, 758 A.2d at 65. As the cases relied on by Higgins make patently clear, principal/agency liability is not about holding the agent liable for the actions of the principal.[7] As pled by Higgins, I am confident that Higgins can prove no set of facts in support of this count which would

---

[7]     Higgins is free to make this argument in his ongoing state law action against Leo Higgins in the hopes of holding Leo liable for the actions of Tibbetts, but it makes absolutely no sense, in a action where Leo Higgins is not a defendant, to seek to assert that Tibbetts is an agent for a non-defendant principal.

entitle him to relief against Tibbetts under 14 M.R.S.A. § 6014(1).  See <u>Feliciano</u>, 160

F.3d at 788.[8]

### Counts II and II: State Law Conversion and Infliction of Emotional Distress

#### Apropos the County Defendants

The defendants argue that Penobscot County and Sheriff Ross are entitled to

summary judgment on these two remaining state law counts under the Maine Tort Claims

Act.    They cite to section 8103(1) of Maine Revised Statute Annotated title 14, which

provides: "Except as otherwise expressly provided by statute, all governmental entities

shall be immune from suit on any and all tort claims seeking recovery of damages. When

immunity is removed by this chapter, any claim for damages shall be brought in

accordance with the terms of this chapter." 14 M.R.S.A. § 8103(1).  There is no factual

dispute to support the conclusion that the exceptions to immunity of 14 M.R.S.A. § 8104-

A are applicable.  Accordingly, I conclude that Penobscot Count and Sheriff Ross are

entitled to judgment as a matter of law as to Counts II and III.

#### Apropos Tibbetts

In defense of Tibbetts under Counts II and III, the defendants' motion seeks

summary judgment under the personal immunity for employees provision of the Maine

Tort Claims Act.  It provides, as relevant:

> **Immunity.** Notwithstanding any liability that may have existed at
> common law, employees of governmental entities shall be absolutely
> immune from personal civil liability for the following:
> ....
>> **C.** Performing or failing to perform any discretionary function or
>> duty, whether or not the discretion is abused; and whether or not
>> any statute, charter, ordinance, order, resolution, rule or resolve

---

[8]        It is also worth noting that in his summary judgment factual statements, Barry Higgins asserts that
he, and not Leo Higgins, initiated contact with Tibbetts.  This fact undercuts any suggestion that Leo and
Tibbetts had a pre-hatched agent/principal (or conspiratorial) arrangement.

> under which the discretionary function or duty is performed is
> valid;
> ....
> **E.** Any intentional act or omission within the course and scope of
> employment; provided that such immunity does not exist in any
> case in which an employee's actions are found to have been in bad
> faith; or
> ....
> The absolute immunity provided by paragraph C shall be applicable
> whenever a discretionary act is reasonably encompassed by the duties of
> the governmental employee in question, regardless of whether the exercise
> of discretion is specifically authorized by statute, charter, ordinance, order,
> resolution, rule or resolve and shall be available to all governmental
> employees, including police officers and governmental employees
> involved in child welfare cases, who are required to exercise judgment or
> discretion in performing their official duties.

14 M.R.S.A. § 8111(1).  The defendants argue that Tibbetts was performing a

discretionary function in responding to the call apprising him of a familial property

dispute and when telling Barry Higgins to leave.  For his part Higgins argues that, in "a

situation where an officer responds to a dispute between a tenant and a landlord where

the landlord wants the tenant removed from the property, the officer does not have the

discretion to evict the tenant in the absence of a lawful order of conviction."  (Pl.'s Mem.

Opp'n Summ. J. at 7.)

   With respect to the discretionary function analysis, the Maine Law Court

explains:

> We have identified four factors to help determine whether
> discretionary function immunity shields a governmental employee from
> tort liability:
> (1) Does the challenged act, omission, or decision <u>necessarily
> involve a basic governmental policy, program, or objective</u>?
> (2) Is the questioned act, omission, or decision <u>essential to the
> realization or accomplishment of that policy, program, or objective</u>
> (as opposed to one that would not change the course or direction of
> the policy, program, or objective)?
> (3) Does the act, omission, or decision <u>require the exercise of basic</u>

14

> policy evaluation, judgment, and expertise on the part of the
> governmental employee involved?
> (4) Does the governmental employee involved possess the requisite
> constitutional, statutory, or lawful authority and duty to do or make
> the challenged act, omission, or decision?
> See Roberts v. State, 1999 ME 89, ¶ 8, 731 A.2d 855, 857; Grossman [v.
> Richards], 1999 ME 9, ¶ 7, 722 A.2d [371,] 374.

Carroll v. City of Portland, 1999 ME 131, ¶ 7, 736 A.2d 279, 282- 83.

In support of this assertion that Tibbetts cannot meet the third Carroll prong,

Higgins cites to the United State's Supreme Court's Soldal v. Cook County, Illinois, 506

U.S. 56 (1992) which is a case at the heart of his federal Fourth Amendment claim

discussed below.  As the discussion of the post-Soldal parameters of the Fourth

Amendment issues vis-à-vis this type of law enforcement duty illustrates, I absolutely

disagree that Soldal supports a conclusion that Tibbetts was not exercising a discretionary

function when he ordered Barry Higgins off the premises.  It simply cannot be said with a

straight face that Soldal made Tibbetts's response to the property dispute at the Carmel

property a "purely ministerial" act.  See Carroll, 1999 ME 89, ¶¶ 8-10, 736 A.2d at 283-

84.

Higgins also argues that a reasonable inference can be drawn from this record that

Tibbetts was acting in bad faith within the meaning of subsection (E) of § 8111(1).

However, the Maine Law Court has concluded that subsection (E) does not apply to

discretionary actions under the subsection (C) umbrella. See Grossman v. Richards, 1999

ME 9, ¶¶ 9, 10, 722 A.2d 371, 374.

### 42 U.S.C. § 1983 Constitutional Claims

#### Fourth and Fourteenth Amendment Claims vis-à-vis Tibbetts

In this motion the defendants are asserting that, even if he violated Higgins's constitutional rights, Tibbetts is entitled to qualified immunity. With respect to the qualified immunity analysis the First Circuit Court of Appeals directs this court to "employ a three-part algorithm." Savard v. Rhode Island, 338 F.3d 23, 27 (1st Cir. 2003) (citing Suboh v. Dist. Att'y's Office, 298 F.3d 81, 90 (1st Cir.2002) and Hatch v. Dep't for Children, Youth and Their Families, 274 F.3d 12, 20 (1st Cir.2001)). "The threshold question" the Court explains,

> is whether the plaintiffs have established a constitutional violation. Hope v. Pelzer, 536 U.S. 730, 736 (2002); Saucier v. Katz, 533 U.S. 194, 201 (2001). The second question deals with fair warning; it asks whether the law was clearly established at the time of the constitutional violation. Hope, 536 U.S. at 739-41; Anderson, 483 U.S. at 638-40. The final question is whether a reasonable official, situated similarly to the defendant(s), would have understood that the conduct at issue contravened the clearly established law. Saucier, 533 U.S. at 202.

Id. [9]

### *The Fourth Amendment Claim*

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not

---

[9]    With respect to both the Fourth and Fourteenth Amendment claims the defendants do not contest Higgins's assertion that Tibbetts's conduct met the state action requirement of such claims. Compare Moore v. Carpenter, 404 F.3d 1043,1046-47 (8th Cir. 2005) (officers summoned to the scene of a boat repossession to resolve breach of the peace did not help the repossessor enough to constitute state action, noting that even if the officers went too far it was not clearly established that their conduct under the precise circumstances of this case would amount to state action so that officers would be entitled to qualified immunity in any event); Meyers v. Redwood City, 400 F.3d 765, 770-74 (2005) (addressing Fourth and Fourteenth Amendment claim vis-à-vis a self-help repossession of a vehicle to which officers responded, concluding that the officers were not sufficiently enmeshed in the repossession to attribute the seizure to the state under either amendment and noting that if they had crossed the state action line they would be entitled to summary judgment because "the officers could not have determined at what point in the middle of this messy repossession they deprived Meyers of her property without due process of law"); Marcus v. McCollum, 394 F.3d 813, 818 (10th Cir. 2004) ("Although we have not examined the state-action issue in the context of police officer involvement with a private party's repossession of property, several other circuits have. These circuits are in agreement as to the law: officers are not state actors during a private repossession if they act only to keep the peace, but they cross the line if they affirmatively intervene to aid the repossessor.") (footnote omitted).

be violated."  With respect to his Fourth Amendment claim Higgins identifies <u>Soldal</u> as

establishing the Fourth Amendment right not to have his possessory interest as a tenant

seized unreasonably by Tibbetts.

In <u>Soldal</u> the United States Supreme Court reasoned:

> A "seizure" of property, we have explained, occurs when "there is some meaningful interference with an individual's possessory interests in that property." <u>United States v. Jacobsen</u>, 466 U.S. 109, 113 (1984). In addition, we have emphasized that "at the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home." <u>Silverman v. United States</u>, 365 U.S. 505, 511 (1961). <u>See</u> <u>also</u> <u>Oliver v. United States</u>, 466 U.S. 170, 178-79 (1984); <u>Wyman v. James</u>, 400 U.S. 309, 316 (1971); <u>Payton v. New York</u>, 445 U.S. 573, 601 (1980). As a result of the state action in this case, the Soldals' domicile was not only seized, it literally was carried away, giving new meaning to the term "mobile home." We fail to see how being unceremoniously dispossessed of one's home in the manner alleged to have occurred here can be viewed as anything but a seizure invoking the protection of the Fourth Amendment. Whether the Amendment was in fact violated is, of course, a different question that requires determining if the seizure was reasonable. That inquiry entails the weighing of various factors and is not before us.

506 U.S. at 61-62.

The seizure of Soldal's mobile home was undeniably more tangible than the

seizure described by Higgins.  However, Higgins makes the following argument for why

<u>Soldal</u> extends to the facts underlying his claim:

> The United States Supreme Court decided in 1992 that property interests are protected by the Fourth Amendment even though privacy or liberty may not be implicated. <u>Soldal v. Cook County, Illinois</u>, 506 U.S.56 (1992). In <u>Soldal</u>, the Court held that sheriff's deputies who stood by to "keep the peace" while Soldal's landlord effected an illegal eviction, and thereby prevented Soldal from exercising reasonable force to protect his property from seizure, may be liable for violating Soldal's Fourth Amendment rights. The court noted that a "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." <u>Id.</u> at 61, quoting <u>United States v. Jacobsen</u>, 466 U.S. 109, 113 (1984). In the present case, the actions of Deputy Tibbetts in forcing Barry Higgins to leave his residence under threat of arrest if he failed to do so constitutes a meaningful interference

with his possessory interest in that property. See Thomas v. Cohen, 304 F.3d 563 (6th Cir. 2002)("Escorting tenants from their residences in the course of effectuating an eviction, as in this case, satisfies the requirement of 'meaningful interference' with their leasehold interest so as to amount to a seizure of their property."). As such, Deputy Tibbetts violated Barry Higgins's Fourth Amendment rights if the seizure was "unreasonable." Soldal, 506 U.S. at 71 ("reasonableness is still the ultimate standard under the Fourth Amendment").

(Pl.' Mot. Partial Summ. J. at 5-6.)  Thus, it is this "meaningful interference with his possessory interest" that is the seizure of which Higgins complains.[10]

The Thomas plaintiffs' Fourth Amendment claim is rather four-square with Higgins's claim (if his version of the facts is credited); the Thomas plaintiffs were ordered to leave a women's shelter at which they were rent-paying residents.  As to the plaintiffs' Fourth Amendment claim the leading opinion by Circuit Judge Clay reasoned:

> Forcible eviction of tenants, even if in a more peaceful or traditional manner than in Soldal, is by its very nature a meaningful interference with their possessory interests and is therefore no less a deprivation of their constitutional rights when carried out by law enforcement officers in the absence of a legal basis for doing so. The Soldal Court emphasized that " 'at the very core' of the Fourth Amendment 'stands the right of a [person] to retreat into [her] own home,' " id. at 61, 113 S.Ct. 538 (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)), thereby giving us every reason to regard the deprivation of Plaintiffs' possessory interests in their residence as a violation of the Fourth Amendment. To hold otherwise in the context now presented would constitute a departure from precedent. Indeed, we have previously found that mere damage to property inside a home may constitute a meaningful interference with possessory rights. See, e.g., Bonds v. Cox, 20 F.3d 697, 701-02 (6th Cir.1994) (holding that, under Soldal, damage to a house, including broken doors, mutilated vinyl siding, broken desks, and holes in walls, rises to the level of "meaningful interference" with one's possessory interests).
> Finally, the seizure of Plaintiffs' possessory interest in their residence implicates the interests of privacy, security and liberty

---

[10]     The property interest allegedly seized by Tibbetts was not the property inside the building.  And Higgins does not argue that he was seized by the threat of arrest. Compare McCullah v. Gadert, 344 F.3d 655, 661 (7th Cir. 2003); White v. City of Markham, 310 F.3d 989, 992 -97 (7th Cir. 2002); Mellott v. Heemer, 161 F.3d 117, 124 -25 (3d Cir. 1998);  King v. Massarweh, 782 F.2d 825, 827-29 (9th Cir. 1986); Thomas v. Sheahan, Civ. No. 04-4865, 2005 WL 782693, *5 (N.D. Ill. April 5, 2005).

underlying the Fourth Amendment. See Thomas K. Clancy, What Does The Fourth Amendment Protect: Property, Privacy, or Security, 33 Wake Forest L. Rev 307 (1998); Morgan Cloud, The Fourth Amendment During the Lochner Era: Privacy, Property and Liberty in Constitutional Theory, 48 Stan. L. Rev. 555 (1996); William C. Heffernan, Property, Privacy, and The Fourth Amendment, 60 Brook. L. Rev. 633 (1994). First, a tenant has a privacy interest at stake in his or her leasehold. As the Court has stated, the legitimation of expectations of privacy must have a source outside the Fourth Amendment, either by reference to concepts of real or personal property or to understandings that are recognized and permitted by society. Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Because the right to exclude others is one of the main rights attaching to property, tenants in lawful possession of a home or apartment generally have a legitimate expectation of privacy by virtue of having a property interest in a specific piece of real estate. Further, tenants, like all people, enjoy the Fourth Amendment "right ... to be secure in their ... houses." The personal security of tenants is thus threatened when they cannot control their possessions free from unreasonable governmental inference, whether or not these possessions are characterized as real or personal property. Finally, the liberty interest of tenants in controlling their possessions and in being left alone in their own homes would be severely compromised if people were not free from unreasonable governmental interference.

Therefore, assuming that Plaintiffs in the instant case were residents of the Augusta House, it is clear that their possessory interests in their place of residence were meaningfully interfered with when the officers deprived Plaintiffs of their place of residence, thus effectuating a seizure within the meaning of the Fourth Amendment.

304 F.3d at 573-74 (footnote omitted).  However, although neither side to this dispute addressed this quirk about Thomas, one of Judge Clay's panel members doubted that there was a Fourth Amendment seizure, see Id. at 582-83 (Gilman, Cir. J. dissenting in part and concurring in part), and the other stated that "any Fourth Amendment right not to be evicted, if there is one, ha[d] not been demonstrated to be a seizure and ha[d] not yet been clearly established," id. at 583-84 (Wallace, Cir. J., "concurring in part [with Circuit Judge Gilman] and dissenting in part") (emphasis added).  See also Lunini v. Grayeb, 305

F.Supp.2d 893 (C.D. Ill. 2004) (court concluding on similar facts that there was a Fourth

Amendment violation), rev'd on other grounds, 395 F.3d 761 (7th Cir. 2005).[11]

The seizure of the residence in Soldal was a dramatic physical seizure and

removal of a mobile home. What the Soldal Court had to wrestle with was the reasoning

of the Seventh Circuit's decision and the Panel's conclusion that there was no Fourth

Amendment violation because the seizure was not made in the course of public law

enforcement and did not invade Soldal's privacy.  See 506 U.S. at 60, 67-68, 69.   The

Supreme Court did not have to determine if there could be a Fourth Amendment seizure

when there was no actual physical seizure of a tangible interest.   And in its conclusion the

Court distinguished the seizure before it from a typical landlord-tenant dispute:

> The complaint here alleges that respondents, acting under color of
> state law, dispossessed the Soldals of their trailer home by physically
> tearing it from its foundation and towing it to another lot. Taking these
> allegations as true, this was no "garden-variety" landlord-tenant or
> commercial dispute. The facts alleged suffice to constitute a "seizure"
> within the meaning of the Fourth Amendment, for they plainly implicate
> the interests protected by that provision.

Id. at 72.

---

[11]     The District Court in Lunini discussed Soldal in a factual pattern not dissimilar to Higgins's.
Lunini was a male cohabitant of a male city councilman who placed an emergency domestic violence call
and was rewarded with the responding police officers' directive to leave or risk arrest.  Lunini was ordered
to surrender his house key, garage opener, and gate opener, depriving him of access to his companion's
house where he had lived for two years.  Id. at 905 -06.  The District Court noted that there was a dispute
over Lunini's possessory interest but that no eviction action was underway and concluded that there was a
genuine dispute of material fact that he "was seized by being deprived of his access to the property."  Id. at
906.  The Seventh Circuit reversed the District Court on another claim, Lunini's class-of-one equal
protection claim premised on police failure to arrest Lunini's complaining housemate.  395 F.3d 761, 770-
72 (7th Cir. 2005).  The Panel noted that Lunini might be "unhappy with defendant police officers' response
to the incident" but concluded that "it appears highly doubtful that any alleged police misjudgments (if
misjudgments there were) took on constitutional proportions" and declined "to take the unprecedented step
of implying a general constitutional police duty to arrest certain individuals during a response to an isolated
domestic incident," as such a ruling "would threaten to turn every police house call into a potential federal
constitutional lawsuit" Id. at 906. The District Court decision in Lunini contains a footnote indicating that
the court had previously ruled, on March 13, 2002, "that 'there existed clearly established law at the time of
this incident that a seizure occurs in the eviction context, and such action must comport with Fourth
Amendment protections.'" 305 F. Supp. 2d at 906 n. 8.  The referenced order is not available on the court's
electronic docket.

With respect to the physical, seizable nature of the property the Supreme Court noted:  "In holding that the Fourth Amendment's reach extends to property as such, we are mindful that the Amendment does not protect possessory interests in all kinds of property.  See, e.g., Oliver v. United States, 466 U.S. 170, 176-77 (1984).  This case, however, concerns a house which this Amendment's language explicitly includes, as it does a person's effects."  Id. at 544 n.7.  (Oliver concluded that the Framers did not intend the Fourth Amendment to extend to fields.  466 U.S. and 176-177.)  It should also be noted that the cases Soldal relies on in terms of the seizure of property protected by the Fourth Amendment were United States v. Jacobsen, 466 U.S. 109, 124-25 (1984) involving the seizure of  package of powder, and United States v. Place, 462 U.S. 696, 708 (1983) involving the seizure of a suitcase.  Soldal, 506 U.S. at 544.  In his opinion in Thomas, dissenting as to Circuit Judge Clay's determination on the Fourth Amendment claim, Circuit Judge Gilman emphasizes the difference between the physical seizures at issue in Jacobson and Soldal and the absence of a physical seizure of a tangible object in Thomas, see 304 F.3d at 582-83, a want also present in this record.

Not only did Tibbetts not assist in the placement of the garage/residence on a trailer for removal, he did not enter the residence to secure it or its occupants. Compare Tower v. Leslie-Brown, 326 F.3d 290, 296 - 97 (1st Cir. 2003).   And he did not take any steps apropos the exterior of the property to physically bar Tibbetts from re-entry.  For instance, compare Tibbetts's rather passive participation in Barry Higgins's ejection with the facts of Dixon v. Lowery, 302 F.3d 857 (8th Cir. 2002).  There the defendant officers arrived at the property in dispute, the Big Mamou, in a marked car, uniformed, and armed, and stood watch while the person claiming rights superior to the plaintiff's

changed the locks, entered the restaurant, helped clear employees, <u>taking possession of the key and locked the premises</u>. <u>Id.</u> at  862 -66.  The officer/defendants remained at the premises and were on site when the plaintiff returned, at which point the officer defendants told him that he would be kicked out again. <u>Id.</u> at 865-66.  Furthermore, the Eighth Circuit described how the officer "commandeered the facility themselves," undertaking a "'round-the-clock occupation,'" noting that "when an employee attempted to turn a big screen television off, one officer is alleged to have said 'no you just leave that on, we're going to make ourselves at home, we're going to be staying here at night. And we're going to make ourselves at home.'"   <u>Id.</u> at 866 -67.  "The officers," the Panel noted,  "continued to occupy the Big Mamou until Dixon filed suit and their superiors ordered them to terminate their employment at the Big Mamou--a period of more than three weeks." <u>Id.</u>;  <u>compare</u> <u>also</u> <u>Armendariz v. Penman</u>, 75 F.3d 1311, 1320 (9th Cir. 1996) (concluding that a Fourth Amendment-- and not a substantive due process -- claim was possible vis-à-vis allegations a city summarily closed ninety-five buildings over a six-month period, evicting the tenants and driving them to other parts of the city, and boarding the buildings up); <u>Open Inns, Ltd. v. Chester County Sheriff's Dept.</u>, 24 F.Supp.2d 410, 416, 421 (E.D. Pa. 1998) (defendant officers assisted in the repossession of a hotel, staying on the premises for two hours while the repossessors secured offices and maintenance areas, took an inventory of supplies (with the assistant of one of the offices, conduct the court described as neither brief nor passive), and took possession of assets).  And, by ordering Barry Higgins to leave, Tibbetts did not effect any legal change in whether or not Higgins actually had a tenancy interest under Maine law.[12]  In short, I

---

[12]      Such an order for a tenant or house owner to leave his residence is not uncommon in other law enforcement contexts, such as when police respond to "garden variety," <u>Soldal</u>, 506 U.S. at 72, domestic

am doubtful, even if Barry Higgins can prove that he had some possessory interest in the property and that Tibbetts knew about that claimed possessory interest, that Tibbetts could be held accountable for a Fourth Amendment violation for ordering Higgins to leave.  See Thomas, 304 F.3d at 582 -583 (Gilman, Cir. J., concurring in part and dissenting in part) (voicing disagreement with the lead opinion's conclusion that there was a Fourth Amendment violation); id. at 583-84 (Wallace, Cir. J.) ("concurring in part, dissenting in part") (expressing skepticism that there was a Fourth Amendment violation).

### Qualified Immunity and the Fourth Amendment Claim

The above analysis echoes my discussion of the Fourth Amendment issues addressed apropos Higgins's own motion for summary judgment.  However, in their own summary judgment pleadings the defendants assert a qualified immunity defense on behalf of Tibbetts.  So, if I am mistaken as to the absence of a Fourth Amendment claim and the Court concludes that there was a constitutional violation in the 'seizure' of Higgins's possessory interest in the property, the Court must then address the next step in the qualified immunity analysis and determine if the right was clearly established.

I do not regard Soldal standing alone as providing clearly established law on the facts confronted by Tibbetts and no other subsequent Supreme Court cases warrant an extension of its tenets to these facts for purposes of the "clearly established" analysis of the qualified immunity defense.  I could not find precedent in this Circuit that signaled any willingness to embrace such a Fourth Amendment theory on similar facts.

As for the Sixth Circuit's Thomas, the three opinions were issued August 23, 2002, almost three months after the trespass/eviction incident involving Barry Higgins.  It

abuse incidents.

is also highly significant as to this inquiry that two of the three circuit judges sitting on that panel concluded that, assuming that there was a Fourth Amendment violation, it was certainly not clearly established.  Circuit Judge Gilman voiced his disagreement with the 'lead' opinion's conclusion that there was a Fourth Amendment violation. See Thomas, 304 F.3d at 582 -583 (Gilman, Cir. J., concurring in part and dissenting in part). He considered the first prong of the qualified immunity analysis unnecessary to definitively decide because "whether a seizure actually took place in this case, because, at the very least, a reasonable person in the officers' position would not have known that the eviction in question violated the plaintiffs' Fourth Amendment right to be free from the unreasonable seizure of their real estate interest."  Id.  In the third Thomas opinion Circuit Judge Wallace stated: "I concur with Judge Gilman that the officers are entitled to qualified immunity on the Fourth Amendment claim because any Fourth Amendment right not to be evicted, if there is one, has not been demonstrated to be a seizure and has not yet been clearly established." Id. at 583 (emphasis added).[13]

In one case relied on by Higgins Marcus v. McCollum, two Panel members, over a dissent, concluded apropos the repossession of a car assisted by police officers, that the Fourth Amendment right was established by Soldal without analysis and then did not analyze whether this right was clearly established independent of the "reasonable officer" inquiry. 394 F.3d 813, 823 -24 (10th Cir. 2004).  That case focused primarily on the "state action" requirement and the panel members focused on parsing that issue.  Not only was this case decided well after the events of May 2002, Senior Circuit Judge

---

[13]     The parenthetical to the Wallace decision indicates he is concurring in part and dissenting in part, but his concurrence is with the Gilman dissent, so he is in fact dissenting from Clay's Fourth and Fourteenth Amendment determinations.  This means to me that the 'majority' holds – or at least expresses grave skepticism – that there was no Fourth Amendment violation.

Seymour, wrote a strong dissenting opinion.  Id. at 824 -830.   Higgins also relies on

Open Inns, Ltd., but in that case, involving a repossession of a hotel, the District Court

noted that defendants had conceded that the right was clearly established on grounds that

a state court had concluded that the state's self-help eviction for non-payment of rent

scheme violated the Fourteenth Amendment. 24 F. Supp. 2d at 419- 20 & n.20.  The

Court then cited Soldal and the defendants' concession that Soldal created a cause of

action under the Fourth and Fourteenth amendment and denied qualified immunity on the

Fourth Amendment claim.  Id.  at 420. (The Court simply elected not to address the

procedural due process claim. Id. at  417 n.15.)[14]  I do not consider this case to be a

beacon that would guide law enforcement officers in Maine.

     In my own search of the law in this area I could find very little that I would

consider being "clearly" established law applicable to this sort of Fourth Amendment

claim.  For instance, in November of 2002 one panel of the Seventh Circuit concluded

vis-à-vis very similar police conduct – the plaintiff/tenant being asked to leave the

premises under threat of arrest -- that the right of the tenant (as opposed to the possessory

interest) not to be "seized" was not clear at all and was certainly not clearly established in

the spring of 1999. White v. City of Markham, 310 F.3d 989, 996 -97 (7th Cir. 2002).

     In my view, the contours of the Fourth Amendment right were not in May 2002

sufficiently clear that a reasonable official would understand that telling Higgins to leave

or face arrest -- but not in any other way entering or seizing the property in which he

claimed an interest -- amounted to a Fourth Amendment seizure.  See Hope v. Pelzer, 536

---

[14]     Higgins cites to Perry v. Sheahan, 222 F.3d 309 (7th Cir. 2000) as one of the case that established Higgins's Fourth Amendment right but that case involved the seizure of firearms without a warrant. Higgins also cites to Dixon, however, as I pointed out above, that case involved officer conduct that was more akin to an extended occupation of the premises by the officers.

U.S. 730 (2002) ("Despite their participation in this constitutionally impermissible conduct, respondents may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).").

### Fourteenth Amendment Claim

Vis-à-vis his Fourteenth Amendment claims Higgins argues:

> It is well-established that possessory interests in property invoke procedural due process protection. See Fuentes v. Shevin, 407 U.S. 67, 87 (1972). At the core of procedural due process jurisprudence is the right to advance notice of a significant deprivation of liberty or property, and to a meaningful opportunity to be heard prior to that deprivation. See LaChance v. Erickson, 522 U.S. 262 (1998); Boddie v. Connecticut, 401 U.S. 371 (1971).
>
> In a factually similar case, the Third Circuit Court of Appeals held that a police officer who assisted a private party in taking possession of a van from her former husband in a dispute over ownership of the van violated the former husband's right to procedural due process. The court explained:
>
>> At the heart of Fuentes [supra] is the principle that it is not for law enforcement officers to decide who is entitled to possession of property. Rather, it is the domain of the courts, and citizens are to have a meaningful opportunity to be heard as to their rights before they are finally deprived of possession of property. Diehl's curbside courtroom, in which he decided who was entitled to possession, is precisely the situation and deprivation of rights to be avoided.
>
> Abbott v. Latshaw, 164 F.3d 141, 149 (3[]d Cir. 1998). See also Thomas v. Cohen, 304 F.3d at 578 (holding that tenants had a right to procedural due process before being evicted and that officer's actions in removing tenants without a court order of eviction violated their Fourteenth Amendment rights). The present case is indistinguishable from those cases, and Deputy Tibbetts violated Barry Higgins' right to due process as a matter of law when he forced him to leave the premises without any pre-deprivation notice or opportunity to be heard.

(Pl.'s Mot. Summ. J. at 8.)

For their part, the defendants argue that Higgins's Fourteenth Amendment claim is barred because Higgins has an adequate post-deprivation remedy under 14 M.R.S.A. § 6014, at the same time acknowledging that an action under this title could not be brought against Tibbetts.  (Defs.' Obj. Mot. Summ. J. at 3-4 & n.3.)   They argue that Tibbetts's conduct was the  kind of random and unauthorized action that falls under the Parratt v. Taylor, 451 U.S. 527 (1981) and Hudson v. Palmer, 468 U.S. 517 (1984) doctrine and such post-deprivation proceeding was all the process Higgins was due. (Id. at 3.)  See Mard v. Town of Amherst, 350 F.3d 184, 193 (1st Cir. 2003) ("Under the so-called Parratt/Hudson doctrine, due process is not violated where the deprivation is caused by the random and unauthorized conduct of state officials and where the state provides adequate post-termination procedures.").

With respect to Fourteenth Amendment procedural due process analysis, responding to a trespass/disputed eviction is not a random and unpredictable situation, and Tibbetts's alleged failure to assure that Leo had the authority to order Barry off the premises does not, in my reading of the law, make his action the kind of random and unauthorized action that falls under the Parratt/Hudson doctrine relied on by the defendants. In Zinermon v. Burch the Court explained that,"the reasoning of Parratt and Hudson emphasizes the State's inability to provide predeprivation process because of the random and unpredictable nature of the deprivation, not the fact that only property losses were at stake." 494 U.S. 113, 132 (1990).  "In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking." Id.  The First Circuit has cautioned:  "The Parratt-Hudson-Zinermon trilogy

'requires that courts scrutinize carefully the assertion by state officials that their conduct is "random and unauthorized" ... where such a conclusion limits the procedural due process inquiry under § 1983 to the question of the adequacy of state postdeprivation remedies." Brown v. Hot, Sexy and Safer Productions, Inc., 68 F.3d 525, 536 (1st Cir.1995) (quoting Lowe v. Scott, 959 F.2d 323, 341 (1st Cir.1992)).

I do recognize that some circuits have concluded that if there is an established pre-deprivation process provided for in a state law or a policy then any state actor who does not follow these procedures is acting in a random and unauthorized manner and, thus, the due process violation is not actionable.  See  Tinney v. Shores, 77 F.3d 378, 381-82 & n.1(11th Cir.1996) (asking, in a challenge to an attachment, whether the state can anticipate and therefore control the action of a state employee, observing that once a state has established procedures for the effectuation of an attachment it cannot predict whether or not, in a given situation, those procedures will be followed or ignored, concluding that an employee's negligence or an employee's intentional wrongful act, were not preventable beforehand by the state); Reese v. Kennedy, 865 F.2d 186, 187 -88 (8th Cir. 1989) ("To the extent that Reese argues that appellees did not follow existing eviction procedures, Parratt provides that a due process deprivation does not occur because of an unauthorized failure of state officials to follow established state procedures. Absent a due process challenge to the state procedures themselves, Reese has failed to state a procedural due process claim) (citations omitted); Wilson v. Civil Town of Clayton, 839 F.2d 375, 378, 380-83 (7th Cir. 1988) (town marshals who evicted customers and employees from "the Poverty Shop," an establishment owned by plaintiff, did not do so according to an official town policy (or custom) and therefore their action

were random and unauthorized under <u>Parratt</u>); <u>King v. Massarweh</u>, 782 F.2d 825, 826 -

27 (9th Cir. 1986) ("The conduct [evicting tenants, taking them and property into

custody] of the defendant police officers here appears to have been random and

unauthorized. The officers acted in response to landlord's call. They did not act in

accordance with established state procedures but instead acted in violation of police

procedures promulgated by the San Francisco Police Department.").[15]  If one were to

follow this line of cases there could be no remedy for individual instances of the

improper denial of pre-deprivation process except for in cases where the law, policy, or

custom is infirm under the Fourteenth Amendment.  See <u>Winters v. Board of County

Com'rs</u>, 4 F.3d 848, 856 -57 (10th Cir. 1993) (addressing the inappropriate disposition of

a ring by a sheriff's department in contravention of a state statute which established pre-

deprivation procedures, concluding that the sheriff's department could not ignore those

procedures on the grounds that post-deprivations remedies were to be had); <u>see also</u>

<u>Thomas</u>, 304 F.3d at 576 ("The government's interest in enforcing a landlord's

---

[15]      In a case involving the seizure of the plaintiff's driver license, the District Court in <u>Fox v. Van
Oosterum</u> reasoned:

>        Plaintiff contends that, despite the fact that the state officials' actions in
> withholding plaintiff's license were taken without legal authority, he was nevertheless
> entitled to predeprivation process. Arguing that the deprivation was caused by a state
> custom or policy of failing to train, discipline and supervise its employees, plaintiff
> asserts that defendants' actions may not be considered random and unauthorized. This, he
> claims, means that under <u>Parratt</u> he is entitled to predeprivation process.
>        While plaintiff's basic premise is correct--that actions taken in accordance with a
> state custom or policy are not unauthorized--his procedural due process claim fails
> because he has not articulated such a policy. As previously discussed, plaintiff has failed
> to provide the Court with facts demonstrating a need for more or different training.
> Because the policymakers could not have anticipated the random act of a state employee
> in this isolated set of circumstances, predeprivation process was impossible. See <u>Parratt</u>,
> 451 U.S. at 541. Thus, defendants Hartrum and Van Oosterum's actions, even if
> intentional, are considered random and unauthorized for the purpose of this inquiry and
> plaintiff's claim will fail unless he pleads and proves that the state remedies available to
> him were inadequate. <u>Copeland v. Machulis</u>, 57 F.3d 476, 478 (6th Cir.1995) (citing
> <u>Hudson v. Palmer</u>, 468 U.S. 517, 531-33 (1984) and <u>Parratt</u>, 451 U.S. at 543-44.).

987 F.Supp. 597, 604 -05 (W.D. Mich. 1997).

unauthorized directives pales in comparison to the importance of Plaintiffs' interest in maintaining possessory rights to their place of residence. Therefore, postdeprivation remedies of any sort would be inadequate.").

The contours of the pre-deprivation process due precedent to Tibbetts's participation in Barry Higgins's temporary removal from the premises has not been precisely elucidated by either party.  According to Higgins the pre-deprivation process Tibbetts could have provided was assuring that there was a valid writ of possession or, at least, the undertaking of a proper investigation of the disputed ownership interest. See Kelley v. LaForce, 288 F.3d 1, 7 n.3 (1st Cir. 2002).   In Kelley, the First Circuit appeared to acknowledge the viability of a Fourteenth Amendment due process claim brought by a plaintiff who claimed to have an interest in a pub who was evicted from the premises with the assistance of police officers. 288 F.3d at 4 -9 & n.4 (not mentioning post-deprivation remedies but addressing several contemporaneous state law claims arising from the same conduct and noting in a footnote that "[i]t is unclear exactly which constitutional right appellants believe was violated," but for the sake of "clarity" proceeding as though a due process claim were alleged).[16]  The First Circuit noted that defendants claimed that they believed that the employee of the plaintiff that they evicted

---

[16]      This is not the conventional type of pre-deprivation notice and opportunity-for-a-hearing process situation.  If it were not for Kelley I might pause long and hard before assuming that the Fourteenth Amendment is even implicated by an officer's peacekeeping presence during /participation in an eviction. At least one Circuit Court Judge has questioned whether having an officer situated as Tibbetts attempt to verify competing claims of ownership would violate the procedural protections of the Fourteenth Amendment.  See Marcus, 394 F.3d at 828 (Brorby, Sen. Cir. J., dissenting) (noting also that the competing claims of ownership were still not resolved at the time of appeal).   Imposing this kind of constitutional duty to preside over a curbside-courtroom on law enforcement personnel untrained in this area is a very valid concern in my view.  Absent the erection of this curbside courtroom, what sort of predeprivation process can an officer afford in this sort of situation when called upon to prevent a perceived breach of the peace ?

was no more than a trespasser rather than that they were confiscating any property interest, id. at 8, [17] as is Tibbetts's story here.

Barry Higgins asserts that he told Tibbetts that he had a possessory right to be on the property and, if this allegation is true, the pre-deprivation "safeguard" of assuring that Leo had a proper eviction order would potentially have substantial "value in preventing an erroneous deprivation of the protected interest." Mard, 350 F.3d at 193; see also Zinermon, 494 U.S. at 132-33 ("In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking."); Fuentes v. Shevin, 407 U.S. 67, 81-82 (1972) ("If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented. At a later hearing, an individual's possessions can be returned to him if they were unfairly or mistakenly taken in the first place. Damages may even be awarded to him for the wrongful deprivation. But no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred.").   The problem with applying this line of cases to the type of situation at issue in Kelley or in this case, is that an officer responding to a citizen's call cannot be expected to provide notice and an opportunity for a hearing to all the interested parties. In the final analysis the officer is going to be called upon to make an onsite determination vis-à-vis competing claims of rights.  If his conclusion about one side or the other's legal rights turn out to be incorrect, the officer will have violated that party's constitutional right to due process without anyone ever being called upon to explain exactly what process it was that was due the complaining party.  While I have already expressed my

---

[17]     Kelley himself was not at the property but was incarcerated on an unrelated charge. Id. at 5.

concern regarding the viability of a Fourth Amendment claim on these facts, to accept that Higgins's version of the facts supports a Fourteenth Amendment claim seems to me to be even more implausible.  However, in light of <u>Kelley</u> I will accept that a Fourteenth Amendment due process constitutional violation is made out when a police officer has been told by an alleged "trespasser" that the person is a lawful tenant and the officer then fails to make some further (unspecified) inquiry into the legitimacy of the 'tenant's' claim.

### *Qualified Immunity and the Fourteenth Amendment Claim*

With respect to Tibbetts's entitlement to qualified immunity, the First Circuit's <u>Kelley</u>, at first blush, seems to counsel against granting his request to exit this litigation at this juncture.  The Panel explained that summary judgment was improvidently granted to the defendant because there was a dispute about what the officers knew concerning competing claims of ownership interests in a pub from which the plaintiff (claiming to have an interest) was evicted.  288 F.3d at 4 -9.

> Although "[w]e recognize that the immunity question should be resolved, where possible, in advance of trial," pre-trial resolution sometimes will be impossible because of a dispute as to material facts. <u>Swain [v. Spinney</u>, 117 F.3d  [1,] 10 (1st Cir. 2002). In such a case, the factual issues must be decided by the trier of fact, thereby precluding summary judgment. <u>See id.</u> Only after the facts have been settled can the court determine whether the actions were objectively reasonable so as to fall under the qualified immunity umbrella. <u>See id.</u>
> This is such a case.

<u>Id.</u> at 7 (footnote omitted).  The Panel stated that there was a dispute of the facts as to what the officers knew or believed and that the reasonableness of the officer's conduct turned on a determination of the disputed facts, that is whether the officers knew that the plaintiff had an ownership interest in the property or whether, as the defendants claimed, they were evicting a trespasser.  <u>Id.</u> at 8.

However, Kelley is not much help in addressing head-on the second prong of the qualified immunity analysis, that is whether or not the Fourteenth Amendment right was clearly established (in the fall of 1996).  The Panel rebukes the District Court for leaping over this question, id. at 7 ("Here, however, the district court failed to consider ... whether appellants had alleged a violation of a 'clearly established' right"), but the Panel itself punted the question of whether it was or was not clearly established, id. at  8-9  ("In sum, assuming, but not deciding, that the appellants adequately alleged a violation of a clearly established due process right, the district court was faced with a material factual dispute as to whether the defendants' conduct was reasonable so as to entitle them to immunity"), and ultimately remanded the case.  The District Court's docket shows that Kelley filed an amended complaint on May 29, 2002, and the 42 U.S.C.§ 1983 count (whether amended or not, it is not clear) charged that the defendants' conduct violated his rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments and that the case settled via an alternative dispute mediation on July 24, 2002.   Accordingly, Kelley sheds little light on the question of whether there was a clearly established Fourteenth Amendment right at the time, ironically, in question here.

In Thomas – which, once again, was issued three months after the Higgins's ejection --  two panel members agreed that (as for the events of December 1998 that it addressed) the right was clearly established by Fuentes and United States v. James Daniel Good Real Property, 510 U.S. 43 (1993), as well as Kentucky laws that forbad self-help evictions.  However, this conclusion apropos the clearly established nature of the Thomas claim is not unimpeachable.   Fuentes addressed the constitutionality of Florida and Pennsylvania laws authorizing the summary seizure of goods or chattels in a person's

possession under a writ of replevin upon the ex parte application of any other person who claims a right to them and posts a security bond without notice or prior hearing being given to the possessor.  407 U.S. at 69-70.   James Daniel Good Real Property addressed "whether, in the absence of exigent circumstances, the Due Process Clause of the Fifth Amendment prohibits the Government in a civil forfeiture case from seizing real property without first affording the owner notice and an opportunity to be heard."  510 U.S. at 46. The Thomas decision also referenced Flatford v. City of Monroe as supporting this conclusion, but that case addressed, what it described as, "the difficult questions regarding what process is due when our government evicts its citizens from their homes in an emergency and the allowance we should give public officials for any misjudgment of the circumstances."  17 F.3d 162, 165 (6th Cir. 1994).  In my view these cases were not clearly controlling of Fourteenth Amendment claims vis-à-vis Thomas officers 'response-to/participation-in a private party's efforts to eject/evict a trespasser/tenant.[18] And while a caution to officers not to participate in civil evictions without a court order may be printed in the training manuals and may be widely understood to be a wise rule, this does not translate into a clearly established constitutional mandate.  In my view Tibbetts is entitled to qualified immunity on the Fourteenth Amendment claim as the right asserted to have been violated was not clearly established in May 2002.  I have not seen one case in which the court explains what process is due to a trespasser/tenant from the responding police officer.  Fuentes and its progeny explain that the laws, regulations, customs, and policies of governmental agencies must provide for notice and an

---

[18]      In Dixon the Eighth Circuit notes that there are both Fourth and Fourteenth Amendment claims but in the discussion of the constitutional violations focuses in on case law pertaining to Fourth Amendment violations, including Soldal and Jacobsen. 302 F.3d  at  862 -63.  When addressing the defendants' argument that the property right were not clearly established, the Panel cites primarily to Soldal (which solely addressed the Fourth amendment claim) and to Fuentes only as a cf..  Id. at 864.

opportunity to be heard prior to the deprivation of a property interest.  But those cases do not explain what process should be forthcoming in this sort of situation.  As of 2002 a reasonable police officer in Tibbetts's situation, under Higgins's version of the facts, would not have realized that he had violated a clearly established  Fourteenth Amendment constitutional predeprivation due process right because he instructed Higgins to leave the premises. [19]

---

[19]        This discussion of both the Fourth and Fourteenth Amendment claims presents a perfect example of the type of complicated constitutional inquiries that casts doubts on the Saucier directive to always determine whether or not the plaintiff has established a constitutional violation prior to proceeding to the qualified immunity inquiry. See Brosseau v. Haugen, __ U.S. __, 125 S.Ct. 596, 600-01 (2004) (Breyer, J, joined by Scalia, J. and Ginsburg, J., concurring).  Brosseau involved a Fourth Amendment claim brought by a plaintiff who was shot in the back while fleeing from the police. In reversing the Ninth Circuit's pro-plaintiff qualified immunity determination, the Court expressed "no view as to the correctness of the Court of Appeals' decision on the constitutional question itself." 125 S.Ct. at 598. In a footnote the Per Curiam opinion states: "We have no occasion in this case to reconsider our instruction in Saucier v. Katz, 533 U.S. 194, 201, 121 (2001), that lower courts decide the constitutional question prior to deciding the qualified immunity question. We exercise our summary reversal procedure here simply to correct a clear misapprehension of the qualified immunity standard." Id. at 598 n.3.  In his concurrence directed at this note alone Justice Breyer explained:

            I join the Court's opinion but write separately to express my concern about the matter to which the Court refers in footnote 3, namely, the way in which lower courts are required to evaluate claims of qualified immunity under the Court's decision in Saucier v. Katz, 533 U.S. 194, 201(2001). As the Court notes, ante, at 598, Saucier requires lower courts to decide (1) the constitutional question prior to deciding (2) the qualified immunity question. I am concerned that the current rule rigidly requires courts unnecessarily to decide difficult constitutional questions when there is available an easier basis for the decision (e.g., qualified immunity) that will satisfactorily resolve the case before the court. Indeed when courts' dockets are crowded, a rigid "order of battle" makes little administrative sense and can sometimes lead to a constitutional decision that is effectively insulated from review, see Bunting v. Mellen, 541 U.S. 1019, 1025(2004) (SCALIA, J., dissenting from denial of certiorari). For these reasons, I think we should reconsider this issue.

Id. at 600-01. The dialogue between Breyer's concurrence and the Per Curiam opinion on the necessity of lower courts undertaking the analysis of difficult constitutional questions even when qualified immunity is an easier basis for the decision means that, until the Supreme Court does reconsider this "rigid 'order of battle,'" this court must first determine whether or not there is a constitutional violation in the first place. See also Meyers v. Redwood City, 400 F.3d 765, 770 (9th Cir. 2005) ("Where the constitutional question is a close one, we might prefer to turn to the second, and easier question, whether the officers violated a clearly established constitutional right. The Supreme Court in Saucier, however, made clear that we must determine whether a constitutional right was violated first "to set forth principles which will become the basis for a holding that a right is clearly established." Saucier, 533 U.S. at 201.").

***Fourth and Fourteenth Amendment Claims vis-à-vis Sheriff Ross and the Penobscot County Sheriff's Department***

First, without an underlying constitutional violation the County Defendants cannot be had liable individually on a failure to train theory or in an official capacity on a policy and custom theory as to the Fourth Amendment claim. See Wilson v. Town of Mendon, 294 F.3d 1, 6 -7(1st Cir. 2002); see also White, 310 F.3d at 998 (same conclusion on similar Fourth Amendment claim).

With respect to Higgins's Fourteenth Amendment claims (and this would hold true apropos the Fourth Amendment claim if the Court concluded that there was a violation under that amendment) the Seventh Circuit has recently issued a decision that perfectly captures the flaw in Higgins's argument and factual record in support of his custom/policy and failure to train claims.  See Calhoun v. Ramsey, __ F.3d __, __, 2005 WL 1163670, *3 -6 (7th Cir. May, 17, 2005).[20]   Higgins is complaining about omissions on the part of the Penobscot Court Sheriff's office and Sheriff Ross in implementing a civil evictions policy and training officers such as Tibbetts in responding to property dispute calls.  In Calhoun the Panel stated:

> A second way of complaining about an express policy is to object to omissions in the policy. This, as we understand the argument, is what Calhoun is doing. In fact, we think that it is more confusing than useful to distinguish between claims about express policies that fail to address certain issues, and claims about widespread practices that are not tethered to a particular written policy. In both of these situations, the claim requires more evidence than a single incident to establish liability. See [City of Okla. v. ] Tuttle, 471 U.S. [808,] 822-23 [(1985)] (challenging the city's police officer training policy as inadequate). This is because it is necessary to understand what the omission means. No government has, or could

---

[20]     Higgins has done a very superficial job of responding to the defendants' argument and material facts as to these claims, principally attacking Sheriff Ross's affidavit on the grounds that he was not the Sheriff at the time. (Pl.'s Mem. Opp'n Summ. J. at 4-6.)  I have addressed this argument in my order on the motion to strike.  Higgins has utterly failed to provide any legal argument or factual support (beyond the mailing of copies of the training manual years prior) in defending the defendants' motion.

have, policies about virtually everything that might happen. The absence of a policy might thus mean only that the government sees no need to address the point at all, or that it believes that case-by-case decisions are best, or that it wants to accumulate some experience before selecting a regular course of action. At times, the absence of a policy might reflect a decision to act unconstitutionally, but the Supreme Court has repeatedly told us to be cautious about drawing that inference. See, e.g., Bd. of the County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 409 (1997) (rejecting Monell claim based on absence of more thorough screening of candidates for sheriff's deputy); City of Canton v. Harris, 489 U.S. 378, 388 (1989) (rejecting a failure-to-train claim).

Both in the "widespread practice" implicit policy cases and in the cases attacking gaps in express policies, what is needed is evidence that there is a true municipal policy at issue, not a random event. If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work, not the kind of isolated incident that Brown held cannot support municipal liability. So, for example, in addressing whether a city's failure adequately to train its police officers amounted to a policy for Monell purposes, the Supreme Court had the following to say:

> [T]he word "policy" generally implies a course of action consciously chosen from among various alternatives; it is therefore difficult in one sense even to accept the submission that someone pursues a "policy" of "inadequate training," unless evidence be adduced which proves that the inadequacies resulted from conscious choice--that is, proof that the policymakers deliberately chose a training program which would prove inadequate.

Tuttle, 471 U.S. at 823 (footnote omitted); see also Harris, 489 U.S. at 388 (finding liability should be imposed only when the degree of fault rises to the level of "deliberate indifference" to rights, that is, where the municipality's "choice to follow a course of action is made from among various alternatives by ... policymakers.") (quoting Pembaur v. Cincinnati, 475 U.S. 469, 483-84 (1986) (Brennan, J., plurality)).

Accordingly, the Court has held that "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the causal connection between the [omission in the policy] and the constitutional deprivation." Tuttle, 471 U.S. at 824 (footnote omitted). Even though the Court in Harris did not absolutely foreclose the possibility that a plaintiff might succeed in proving a failure-to-train claim without showing a pattern of constitutional violations, see 489 U.S. at 390 & n. 10, it later clarified that it was "simply hypothesiz[ing] that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Brown, 520 U.S. at 409. Although the Court has therefore left

room for this "narrow range of circumstances," it is telling that no court has directly addressed such a case. <u>Cf.</u> <u>Woodward v. Correctional Medical Services</u>, 368 F.3d 917, 929 (7th Cir.2004) (commenting that evidence of a single violation may be enough where a jail takes no precautions against the possibility of inmate suicide but imposing liability based on the jail's repeated failures to ensure one inmate's safety and condoning violations of its own suicide-watch policy).

<u>Id.</u> at *4-5.

I find this case highly persuasive apropos Higgins's policy and custom claim and his failure to train claim and, guided by it, I conclude that the undisputed material facts as to these claims set forth above support granting the defendants' summary judgment on the custom and policy and failure to train claims.[21]  And to the extent that Higgins seeks to hold Ross liable on a distinct supervisory theory, he has not controverted the facts material to this inquiry in a way sufficient to create a genuine dispute of fact.  <u>See</u> <u>Lipsett v. University of Puerto Rico</u>, 864 F.2d 881, 901 -902 (1st Cir. 1988).

### *Conclusion*

For these reasons I recommend that the Court **GRANT** the defendants motion for summary judgment as to all counts of the complaint.

### <u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum,

---

[21]     Ironically, it is Higgins who submits, in support of his own motion for summary judgment, the reports documenting prior responses to the Carmel, Maine property that reveal how other officers refused to intervene in the matter on the grounds that they could not properly do so.  (Pl.'s SMF Exs. A & B, Docket No. 15.)

within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

Dated:  June 2, 2005.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge